SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**J.B. v. W.B.** **(A-111-11) (069972)**

**Argued March 11, 2013 -- Decided August 20, 2013**

**CUFF, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

In this appeal, the Court considers for the first time the role of a special needs trust for the benefit of an adult, unemancipated, disabled child and under what circumstances a child support obligation under an existing negotiated agreement may be modified to allow for the creation of a special needs trust.

Plaintiff J.B. and defendant W.B. were married in 1985 and have two children. A.B., who was born in 1988, is autistic. J.B. and W.B. divorced on October 10, 2002, and entered into a comprehensive post-settlement agreement (PSA) which addressed child support obligations but deferred issues regarding post-secondary school education. The parties recognized that A.B. likely would never be emancipated, and J.B. agreed to continue paying his expenses, including medical, psychological, and special education costs. While establishing life insurance terms, the parties contemplated creation of a special needs trust to protect the proceeds A.B. eventually would receive.

In 2009, A.B., who was twenty-one, began attending a post-secondary school in Connecticut for persons with special needs. Later that year, J.B. moved to direct his child support payments for A.B. into a special needs trust designed to fund A.B.'s educational and living expenses. J.B. asserted that his salary had decreased since creation of the PSA, the parties should prepare for the possibility of his untimely death, and W.B. should not receive A.B.'s support payments now that A.B. resides at school. He further asserted that A.B. would be ineligible for certain government benefits if the support payments were not paid into a special needs trust. The trial court denied J.B.'s motion, finding that he failed to show changed circumstances warranting relief from the PSA.

J.B. appealed, and the Appellate Division affirmed. The panel noted that the PSA contemplated many of the hypothetical situations posed in J.B.'s modification request. Moreover, both parties understood that A.B. likely never would be emancipated and J.B.'s obligations to him would remain throughout his life. J.B. also did not establish with certainty that a special needs trust would render A.B. eligible for any government benefits. Rather, the panel saw J.B.'s motion as nothing more than a self-serving effort to revise the PSA in a manner favorable to him. Finally, because A.B. was not a party and there were no issues involving parenting time or custody, the panel rejected J.B.'s argument that the trial court should have appointed a guardian ad litem. The Court granted J.B.'s petition for certification. 210 N.J. 217 (2012).

**HELD:** A parent seeking to modify a negotiated agreement for the support of a disabled child through the establishment of a special needs trust must present a specific plan and demonstrate how the proposed trust will benefit the disabled child. When a disabled child is the subject of a proposed special needs trust, it is within the trial court's discretion to appoint a guardian ad litem.

1. Special needs trusts allow disabled individuals to maintain eligibility for needs-based government benefits, a use that was authorized by Congress under the federal Omnibus Budget Reconciliation Act of 1993 and in New Jersey by N.J.S.A. 3B:11-37(b). Assets placed in a special needs trust by disabled individuals, or persons acting on their behalf, are not considered "available assets" for purposes of determining Supplemental Security Income (SSI) and Medicaid eligibility. Several requirements must be met in order for trust assets to be excluded from the disabled person's income, including that the assets will supplement, not supplant, government benefits. In New Jersey, child support paid to a parent is considered an asset of the child and will disqualify the child from receiving government benefits. In light of the protections afforded by a special needs trust, it can be an effective tool in planning for the future of a disabled child, although parents may choose to fund their child's future directly in order to avoid the limitations placed on trust funds and eliminate governmental intrusion. (pp. 15-21)

2. Decisions regarding the modification of child support are reviewed for abuse of discretion. PSAs are enforced according to the parties' original intent, and should not be modified by a trial court absent fraud, unconscionability, or overreaching during negotiations of the PSA. However, in the interest of ensuring fairness in the dissolution of marriages, courts retain the equitable authority to modify privately reached child support agreements. A party to a comprehensive negotiated PSA who is seeking to modify a support obligation must meet the threshold standard of changed circumstances. Changed circumstances are not limited to events unknown at the time of the agreement, and include changes in the needs of the child or the income of a parent. In crafting agreements terminating a marriage, divorcing parents are encouraged to anticipate the needs of their children beyond the present circumstances, although even the most thoughtful parents may not anticipate every future event. Therefore, even when a negotiated plan is in place, proposed modifications that may be more advantageous to the child should not be dismissed out of hand. The threshold changed circumstances standard assumes that the parties anticipated the event precipitating the application for modification of the PSA. However, although modification may be unfair if the PSA addresses the changed circumstance, the standard will not bar consideration of the motion for modification where resolution of an acknowledged issue was deferred. In such situations, the guiding principle is the best interests of the child. Redirecting a child support obligation from a parent to a special needs trust should not be considered exceptional or extraordinary relief if the plan is in the child's best interests. (pp. 21-27)

3. Here, the original PSA deferred the issue of post-secondary education, as well as the question of establishing a special needs trust. Because J.B. did not commit to fully fund A.B.'s post-secondary education or all future financial needs, his application to establish a special needs trust should have been evaluated in accordance with the best interests of the child standard. However, J.B.'s application presented little more than a concept, preventing the trial court from reaching an informed decision. Although the record suggests that A.B.'s long-term needs would be better met if he were eligible for government programs, it sheds little light on the fundamental question of whether the current support funds are sufficient to meet those needs. A parent seeking to modify a negotiated agreement for the support of a disabled child must present a specific plan and demonstrate how a proposed trust will benefit the disabled child. At a minimum, the trial court must have a complete understanding of the disabled child's current needs, the cost to support those needs, and any available funding resources. When a proposed plan relies on access to government benefits, it must address eligibility rules, the timespan for attaining eligibility, the length of time before benefits are available once the child is eligible, and the means of defraying current costs without compromising the child's eligibility. The plan also must designate a trustee and address the terms and conditions for disbursement of the corpus of the trust. Because J.B.'s proposed plan meets none of these requirements, the Appellate Division's affirmance of the order denying his motion was proper. (pp. 27-29)

4. No New Jersey rule or statute addresses the question of whether a guardian ad litem should be appointed for a dependent, disabled child who is the subject of a proposed special needs trust. The role of a guardian is to assist the court in determining the best interests of a minor or incompetent individual, and the decision to appoint a guardian is within the trial court's discretion. When a proposed modification may fundamentally affect a disabled child's future, the court should not hesitate to appoint a guardian, and also should seriously consider doing so when one parent resists the other's application to establish a trust. Here, the court did not abuse its discretion by declining to appoint a guardian since the proposed plan was entirely speculative and lacked the detail required for an informed decision as to whether it was in A.B.'s best interests. In the event either parent presents a plan that permits an informed decision, the court should consider appointment of a guardian ad litem. (pp. 29-33)

The judgment of the Appellate Division is **AFFIRMED AS MODIFIED**.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, HOENS and PATTERSON; and JUDGE RODRÍGUEZ (temporarily assigned) join in JUDGE CUFF's opinion.**

J.B.,

    Plaintiff-Appellant,

        v.

W.B.,

    Defendant-Respondent.

        Argued March 11, 2013 – Decided August 20, 2013

        On certification to the Superior Court, Appellate Division.

        Bonnie C. Frost argued the cause for appellant (Einhorn, Harris, Ascher, Barbarito & Frost, attorneys; Ms. Frost and Christopher J. Roman, on the briefs).

        Paul A. Rowe argued the cause for respondent (Greenbaum, Rowe, Smith, and Davis, attorneys; Mr. Rowe and Lisa B. DiPasqua, on the briefs).

        Mary M. McManus-Smith argued the cause for amicus curiae Legal Services of New Jersey (Melville D. Miller, Jr., President, attorney; Ms. McManus-Smith, Mr. Miller, and JoAnne T. Mantz, on the brief).

    JUDGE CUFF (temporarily assigned) delivered the opinion of the Court.

    Plaintiff and defendant in this matter are divorced parents of an autistic son who has special needs.  Both acknowledged that he likely would never be emancipated.  At the time of their

divorce, the parents negotiated a property settlement agreement (PSA) that deferred some issues about their son for a later date. Several years later when their son enrolled in an out-of-state post-secondary school, the father filed a motion to establish financial responsibility for their son's education and to establish a special needs trust. Concluding that the PSA addressed the support issues before the trial court and that the father had not demonstrated changed circumstances to warrant a modification of his support obligation, the trial court denied the motion. The trial court also observed that the proposed trust plan lacked sufficient detail to permit an informed decision about whether such a trust would be in the best interests of the child. The Appellate Division agreed and affirmed.

This case presents our first opportunity to consider the role of a special needs trust for the benefit of an adult, unemancipated, disabled child. Although we acknowledge that any application to modify a support obligation must satisfy the threshold requirement of changed circumstances if the PSA fully addressed the issue, maturation of a child and his or her changing needs may satisfy the changed circumstances standard. Moreover, when the parties have deferred future financial arrangements to a later date, the applicant need not demonstrate changed circumstances to permit consideration of the merits of

2

the application.  In all instances, the best interests of the child is the guiding principle.

In this case, the parties deferred certain issues regarding future support of their disabled son, and the father submitted an application to modify the PSA and address the deferred issues.  The application to establish a special needs trust, however, did not contain sufficient information to permit a Family Part judge to determine whether a trust funded by the father and used to supplement certain government benefits better met the son's current and future needs than the arrangement adopted initially in the PSA.  Accordingly, we affirm the judgment of the Appellate Division denying the father's motion to modify his support obligation and to create a special needs trust.  We also set forth non-exhaustive guidelines for consideration by the Family Part of an application to establish such trusts.

I.

Plaintiff J.B. and defendant W.B. married on October 19, 1985.  Two children were born of the marriage:  A.B. on March 11, 1988, and M.B. on July 30, 1991.  A.B. is autistic.

Plaintiff and defendant divorced on October 10, 2002. After two years of litigation, the parties entered into a comprehensive PSA, which addressed most issues relating to the divorce, including child support obligations, but deferred other

3

issues, such as the parties' respective financial obligations for post-secondary school education. The parties agreed to the following child support terms:

> [T]he Plaintiff shall pay to the Defendant the sum of $4,166.66 per child ($50,000 per year, per child) as and for child support. The payments shall be made by the Plaintiff by way of automatic deposit into the Defendant's bank account.

Further, plaintiff agreed that his child support obligations for M.B. would continue until M.B.'s emancipation.[1] In regard to A.B., however, the parties

> recognize[d] that [A.B.] is autistic, has special needs, and probably will never be emancipated. Both parties are committed to a course of action which preserves, promotes and protects [A.B.'s] best interest. The Plaintiff has paid and shall continue to pay for [A.B.'s] unreimbursed and uncovered medical, dental, hospital, surgical, psychiatric, psychological, special education, and other similar expenses which are reasonable and appropriate for [A.B.]

The parties agreed that both M.B. and A.B. should "attend and accomplish the highest level of schooling/education possible for that child." The parties, however, did not make specific arrangements in the PSA for the payment of each child's post-high school education. The parties agreed that, "[i]f the

---

[1] Pursuant to the PSA, if M.B. took "[p]ermanent residence away from the residence of both custodial parents, . . . not includ[ing] residence while away at college," he would be considered "emancipated" for purposes of plaintiff's child support payments.

4

parties are unable to agree as to the payment of [post-high school] educational costs and expenses, either will have the right to apply to the [c]ourt for appropriate relief."

Plaintiff also agreed to continue A.B.'s medical insurance and to maintain life insurance policies naming the children as beneficiaries. Plaintiff agreed to maintain a $1.5 million life insurance policy, which later increased to $2.5 million. In establishing life insurance terms, the parties also contemplated the creation of a special needs trust, agreeing that, "[i]f the plaintiff elects to establish a life insurance trust to fulfill his life insurance obligations[,] . . . [t]he parties shall confer and agree as to the appropriate Trust language which will insulate the proceeds for the protection of the parties' son, [A.B.], such as by creating a 'Special Needs trust.'"

On October 12, 2005, a Family Part judge entered a consent order modifying the parties' judgment of divorce to incorporate the written PSA. From 2005 until 2009, the parties followed the terms of the PSA, and plaintiff paid his support payments directly to defendant.

In 2009, A.B., at the age of twenty-one, finished his education at a state-funded, special needs school, N.J.S.A. 18A:46-6, -13, and began attending a school in Connecticut for persons with special needs. A.B.'s enrollment in the out-of-state program gave rise to the current litigation.

5

On November 20, 2009, plaintiff filed a notice of motion in the Superior Court, Family Part, seeking to direct his child support payments for A.B. into a special needs trust. Specifically, he requested the court: (1) "[e]stablish[] a Special Needs Trust to fund the educational and living expenses of [A.B.] at [the Connecticut school]"; (2) appoint a parent coordinator to assist in establishing the trust; (3) compel defendant to cooperate in the creation of the trust; (4) split the cost of the parent coordinator equally with defendant; (5) "eliminate[] any direct child support obligation to Defendant for the benefit of [A.B.], retroactive to the filing date of the application, based upon the recent enrollment of [A.B.] in a full-time residential facility"; (6) determine the financial contributions of the parties towards A.B.'s educational expenses on a proportional basis; (7) modify the PSA to decrease the amount of life insurance coverage plaintiff is required to maintain and compel defendant to maintain life insurance on her life for A.B.; (8) compel defendant to pay for counsel fees; and (9) provide other relief.

In his certification supporting the motion, plaintiff related that he was no longer an owner of his agency and no longer earned the same salary as he earned at the time of the divorce. He also suggested the parties should prepare for the

possibility of his untimely death. Plaintiff also related that A.B. now resides at a school and, therefore, child support payments should not be made directly to defendant. Plaintiff further asserted that A.B. is not financially prepared for "a time when [plaintiff is] earning less income and ha[s] fewer available resources." Finally, plaintiff asserted that A.B. will be ineligible for certain governmental benefits, including Supplemental Security Income (SSI) and Medicaid, if the child support payments are not paid into a special needs trust. Plaintiff stated that A.B. "may be eligible for certain government benefits programs now and in the future." Plaintiff submitted a letter from an attorney with whom both parents consulted that outlined the purpose of a special needs trust and the government benefits and programs in which A.B. could participate.

In her response to plaintiff's motion and in support of her cross-motion to determine the parental financial obligation for A.B. and M.B., who was applying for college admission at that time, defendant informed the court she did not object to the formation of a special needs trust and, in fact, had already attempted to form one with funds A.B. received from his maternal grandfather. She did, however, object to the termination of direct payment of child support to her before A.B. became eligible for government benefits and programs.

7

The trial court denied plaintiff's motion to establish a special needs trust, finding plaintiff failed to show changed circumstances warranting relief from the terms of the PSA. The court found "[t]he parties absolutely knew that [A.B.] was not going to be emancipated" and, therefore, the parties contemplated that plaintiff would always pay at least $50,000 in child support for A.B. The court also found plaintiff had a life insurance policy in place that would benefit A.B. in the case of the "unfortunate demise" of plaintiff. The trial court emphasized that the parties negotiated the inclusion of life insurance at "arms length."

Plaintiff appealed the trial court's denial of his motion to redirect his support obligation into a special needs trust. Plaintiff also raised the issue of whether the trial court, on its own motion, should have appointed a guardian ad litem for A.B.

The Appellate Division affirmed the trial court's denial of plaintiff's motion to allow payment of child support into a special needs trust. In affirming the trial court's determination, the panel acknowledged the standard for modification of the PSA is changed circumstances and noted plaintiff did not demonstrate any circumstances to warrant modification of the PSA.

8

The panel determined that the parties entered into the PSA with an understanding of A.B.'s future needs, that child support payments would cover A.B.'s day-to-day needs exclusive of schooling, and that "[t]he amount struck by the parties of $50,000 per year in child support reflected that understanding." The panel noted plaintiff further understood he would be responsible for the cost of A.B.'s special education.

The appellate panel remarked that plaintiff's arguments in favor of modification, such as a decrease in salary, were mired in hypotheticals. Additionally, the appellate panel noted that the parties contemplated many of the situations set forth by plaintiff. In regard to the assertion that plaintiff may die prematurely, the panel referred to plaintiff's agreement in the PSA to maintain a life insurance policy to benefit A.B.

The panel also remarked that the parties could have established a special needs trust in the PSA but chose not to do so. Instead, they chose to name A.B. as the beneficiary of a $2.5 million life insurance policy. The parties also contemplated that, one day, plaintiff would be responsible for the costs of A.B.'s special needs education. The parties understood that A.B. would likely not be emancipated and, therefore, that plaintiff's obligations would remain throughout his lifetime.

In regard to the governmental benefits available to A.B., the panel concluded that the facts presented did not establish with certainty that A.B. would be eligible for governmental benefits if plaintiff paid child support into a special needs trust. The panel characterized plaintiff's motion as "a self-serving effort to revise the terms of the PSA to make them more favorable to him" and affirmed the denial of his motion.

The panel similarly rejected plaintiff's argument that the trial judge should have, sua sponte, appointed a guardian ad litem for A.B. The panel concluded that Rule 4:26-2 only applies to minors or incapacitated persons who are parties to an action. A.B. is not a party to the action. It also concluded that this case does not involve a parenting time or custody dispute for which Rules 5:8A and 5:8B would allow the court to appoint a guardian ad litem. The panel determined this case was ultimately about modification of child support that did not warrant appointment of a representative for A.B.

This Court granted plaintiff's petition for certification. 210 N.J. 217 (2012). We also granted Legal Services of New Jersey's (Legal Services) motion to participate as amicus curiae.

III.

A.

Plaintiff asserts that "[s]pecial needs planning is available to special needs children regardless of their wealth." He further asserts that he wishes to pay his child support into a special needs trust to make A.B. eligible for governmental benefits. Plaintiff states that he is not attempting to terminate his child support, instead he simply wants to redirect any child support he pays into a special needs trust in order to permit A.B. to qualify for means-tested benefits. He asserts A.B. is the true beneficiary of the modification.

Plaintiff argues that the Appellate Division's opinion forecloses A.B. from ever receiving governmental benefits without his mother's consent. Plaintiff contends that the Appellate Division's "precedent is dangerous not only to the parties, but even more so to other families who do not have significant financial means." He argues that a parent would be unable to prepare for the future of a special needs child without the consent of the other parent.

According to plaintiff, although courts should uphold PSAs, the needs of a child should not be limited by his or her parents' agreements. Plaintiff states that the courts should have modified any terms "that were detrimental to [A.B.]" in the exercise of its parens patriae responsibility to protect the interests of children by scrutinizing consensual agreements. He

11

states that the court should be driven by the best interests of the child.

Further, plaintiff asserts that, without the representation by a guardian ad litem, "[A.B.] is . . . being deprived of his constitutional right to governmental benefits without due process." He argues that "[a] guardian ad litem would be equipped to represent the best interest of [A.B.] before the court rather than his parents whose applications focused on the conflict between the two of them."

### B.

Defendant responds that plaintiff is attempting to terminate rather than modify his child support obligations. Nonetheless, defendant argues that the circumstances do not warrant an alteration to the PSA, a document which the parties took a long time to consider. She argues that, at the time of the creation of the PSA, the parties had "a full understanding of their child's special needs" and made detailed preparations for A.B.'s care.

Defendant contends that A.B.'s interests are protected by enforcement of the PSA and by "ensuring that [A.B.] would not be relegated to a level of support provided by means tested government programs." She emphasizes that A.B.'s needs should be met "in accordance with the standard of living enjoyed by both of [his] parents." She asserts that the court's ruling was

12

proper, considering plaintiff failed to present a plan of how A.B. would be supported without direct payment to defendant or whether A.B. even qualified for governmental benefits. Defendant also contends that, under the statutory language, she would not have access to the funds to pay for food or clothing for A.B.

Finally, defendant asserts that the Appellate Division properly determined that a guardian ad litem was not necessary in this case and agrees that this appeal is about nothing other than child support.

C.

Amicus curiae Legal Services argues that "the child support statute, the child support guidelines, and the state and federal laws on special needs trusts" all authorize the payment of child support to a special needs trust instead of directly to the custodial parent. Legal Services points to the 2005 amendment to the child support statute, see L. 2005, c. 171, § 1 (codified as amended at N.J.S.A. 2A:34-23(a)), which directs that child support continue past the age of twenty-one for the disabled child and authorizes courts to order the creation of a trust. That amendment, Legal Services argues, "broadened the scope of authority . . . to generally promoting the well-being of the disabled adult child."

Turning specifically to special needs trusts, Legal Services contends that those trusts are specifically allowed to enable a disabled person to enjoy a better standard of living. It argues that special needs trusts have been affirmed as a tool "to undertake planning to preserve assets and maximize public benefits."

Legal Services analogizes this case to In re Keri, 181 N.J. 50, 61-62 (2004), where this Court held that, "when a Medicaid spend-down plan does not interrupt or diminish a ward's care, involves transfers to the natural objects of the ward's bounty, and does not contravene an expressed prior intent or interest, the plan, a fortiori, provides for the best interests of the ward and satisfies the law's goal to effectuate decisions an incompetent would make if he or she were able to act." Legal Services suggests the standard articulated in Keri may be instructive here.

Legal Services also contends that the Legislature intended to encourage the creation of special needs trusts to enable persons with disabilities to benefit from government programs, while still receiving supplemental support. According to Legal Services, although plaintiff would not gain financially, the benefits to A.B. would be significant. Legal Services argues that "[t]he total financial benefit of obtaining SSI and the related Medicaid, in New Jersey[,] is approximately $30,000.00

14

. . . annually." Legal Services does recognize, however, that

here, where plaintiff agreed to continue providing health

insurance for A.B., the value of Medicaid is not readily

apparent.

IV.

In order to evaluate whether the trial court should have

modified the child support agreement to allow plaintiff to pay

child support directly into a special needs trust, we begin with

a general examination of special needs trusts.

A.

A special needs trust is a trust that is intended to allow

a disabled individual to maintain eligibility for certain needs-

based government benefits.[2]  See Waldman v. Candia, 317 N.J.

Super. 464, 472 (App. Div.), certif. granted, 158 N.J. 686

(1999), appeal dismissed, 166 N.J. 599 (2000).  The use of

special needs trusts to protect eligibility for government

benefits was first authorized by Congress when it passed the

federal Omnibus Budget Reconciliation Act of 1993 (OBRA '93),

Pub. L. No. 103-66, § 13611(b), 107 Stat. 312, 625 (codified as

---

[2] Our discussion is confined only to a special needs trust
because plaintiff's motion discussed only that type of trust.
This Court recognizes that other types of trusts may be suitable
to address the needs of disabled, dependent children.  See Gary
Mazart & Regina M. Spielberg, Trusts for the Benefit of Disabled
Persons: Understanding the Differences Between Special Needs
Trusts and Supplemental Benefits Trusts, N.J. Law. Mag., Feb.
2009, at 25-26 (discussing supplemental benefits trusts).

15

amended at 42 U.S.C.A. § 1396p(d)).  OBRA '93 identified certain types of trusts into which disabled individuals, or persons acting on behalf of such individuals, can place assets without those assets becoming "available assets" for purposes of determining Medicaid eligibility.  See ibid.  One such trust is what is known as a special needs trust.  See 42 U.S.C.A. § 1396p(d)(4)(A).  In 1999, Congress extended the protections afforded by the use of a special needs trust, finding that the contents of that type of trust are not considered "resources" or "assets" for purposes of determining eligibility for SSI.  See Act of Dec. 14, 1999, Pub. L. No. 106-169, § 205(a), 113 Stat. 1822, 1833 (codified as amended at 42 U.S.C.A. § 1382b(e)(6)(C)(i)).

Recognizing that the law in New Jersey did "not specifically authorize the establishment of these trusts[,]" N.J.S.A. 3B:11-36(d), in 2000, the Legislature adopted N.J.S.A. 3B:11-37(b).  L. 2000, c. 96, §§ 1, 3.  The statute provides that, "[u]pon the request of an interested party, a court may establish an OBRA '93 trust for a person who is disabled . . . and may direct that the assets of the person with a disability be placed in the OBRA '93 trust."  N.J.S.A. 3B:11-37(b).

The contents of a special needs trust, however, may be excluded from the disabled person's income calculation only if the trust satisfies certain specific requirements.  See N.J.A.C.

16

10:71-4.11(g)(1). The most important requirement, recognized at both the state and federal level, is that the state must "receive all amounts remaining in the trust upon the death" of the trust beneficiary "up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan." 42 U.S.C.A. § 1396p(d)(4)(A); accord N.J.A.C. 10:71-4.11(g)(1)(xii). The implementing regulations contain additional requirements for a trust to qualify as a special needs trust. See generally N.J.A.C. 10:71-4.11(g)(1)(i)-(xviii). The trust must "specifically state that the trust is for the sole benefit of the trust beneficiary[,]" N.J.A.C. 10:71-4.11(g)(1)(ii), and the trust must be irrevocable, N.J.A.C. 10:71-4.11(g)(1)(viii). The trust must also "specifically state that its purpose is to permit the use of trust assets to supplement, and not to supplant, impair or diminish, any benefits or assistance of any Federal, State or other governmental entity for which the beneficiary may otherwise be eligible or which the beneficiary may be receiving." N.J.A.C. 10:71-4.11(g)(1)(iii). A special needs trust is meant to supplement, rather than supplant, government benefits; therefore, if the money placed in a special needs trust is used for "food, clothing or shelter," those expenditures will be considered in-kind support and maintenance and will count as a set amount of income attributable to the

17

child.  N.J.A.C. 10:71-4.11(g)(1)(iii)(1), -5.4(a)(12); see also Mazart & Spielberg, Trusts for Disabled Persons, supra, at 24 (discussing special needs trusts).

Individuals other than the beneficiary may place assets into a special needs trust.  On the other hand, such a trust only qualifies as an OBRA '93 trust if it contains the assets of the beneficiary.  See 42 U.S.C.A. § 1396p(d)(4)(A) (noting exception applies to "trust containing the assets of an individual under age 65 who is disabled").  In New Jersey, "child support belongs to the child[,]" Pascale v. Pascale, 140 N.J. 583, 591 (1995); accord Martinetti v. Hickman, 261 N.J. Super. 508, 512 (App. Div. 1993); therefore, child support paid directly to a parent is considered an asset of the child in the nature of unearned income and will disqualify the child for government benefits, see Mazart & Spielberg, Trusts for Disabled Persons, supra, at 29-30.

Because of the protection a special needs trust affords disabled individuals, it can be used as an effective tool to plan for the future of a disabled minor or adult child.  See Jennifer Brannan, Comment, Third-Party Special Needs Trust: Dead or Alive in a Uniform Trust Code World, 16 Tex. Wesleyan L. Rev. 249, 250-51, 255-56 (Winter 2010).  The effectiveness of special needs trusts has led to express recognition of their importance by the majority of states, including New Jersey.  See

18

N.J.S.A. 3B:11-36(a) ("It is in the public interest to encourage persons to set aside amounts to supplement and augment assistance provided by government entities to persons with severe chronic disabilities."); see also In re Jennings v. Comm'r, N.Y.S. Dep't of Social Servs., 893 N.Y.S.2d 103, 109 (App. Div. 2010) (explaining that New York Legislature codified supplemental needs trust[3] definition in N.Y. Est. Powers & Trusts Law § 7-1.12); In re Riddell Testamentary Trust, 157 P.3d 888, 893 (Wash. Ct. App. 2007) ("The law invites, rather than discourages, the creation of special needs trusts . . . ."); Parkhurst v. Wilson-Coker, 848 A.2d 515, 516-17, 519-21 (Conn. App. Ct. 2004) (explaining purpose of special needs trusts). Indeed, in Hamilton v. Laine, 67 Cal. Rptr. 2d 407, 408 (Ct. App. 1997), the Court of Appeal of California provided an example illustrating the benefits of a special needs trust:

> Without [a] special needs trust, if the minor's cost of care is $6,000 and the month annuity is $5,000, the annuity pays the first $5,000 of the minor's cost of care and [Medicaid] covers the $1,000 difference. With [a] special needs trust, [Medicaid] covers the entire $6,000 and the $5,000 monthly annuity can then be used for the minor's special needs.

Despite the benefits, there are reasons why parents may choose not to employ use of a special needs trust and may

---

[3] Some jurisdictions refer to special needs trusts as supplemental needs trusts. Both are distinguishable from supplemental benefits trusts.

19

instead choose to fund their child's future directly.  Direct parental support avoids the use limitations placed on funds in special needs trusts.  See Craig P. Goldman, <u>Render unto Caesar That Which Is Rightfully Caesar's</u>, but not a Penny More than You Have To:  Supplemental Needs Trusts in Minnesota, 23 <u>Wm. Mitchell L. Rev.</u> 639, 674 (1997) ("For example, money may not be spent for the benefit of others and thus the funds could not be used to pay for travel of family members to visit the beneficiary . . . or to pay for the college education or wedding of another child."  (Alteration in original) (internal quotation marks omitted)).  Opting not to create a special needs trust also

> eliminates governmental intrusions into private family matters, avoids disputes about eligibility for government benefits during the life of the adult child with a disability, does not require an understanding of Medicaid and SSI, and allows parents to fulfill what they may view as their moral obligation to provide for their child.
>
> [Gail C. Eichstadt, Essay, <u>Using Trusts to Provide for the Needs of an Adult Child with a Disability: An Introduction to Family Concerns for Lawyers and a Primer on Trusts for Parents</u>, 45 <u>S.D. L. Rev.</u> 622, 637 (1999/2000).]

V.

With that understanding of special needs trusts in mind, we next turn to the law regarding modification of child support arrangements, beginning with the appropriate standard of review.

A.

"When reviewing decisions granting or denying applications to modify child support, we examine whether, given the facts, the trial judge abused his or her discretion." Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012). The trial court's "'award will not be disturbed unless it is manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice.'" Ibid. (quoting Foust v. Glaser, 340 N.J. Super. 312, 315-16 (App. Div. 2001)).

B.

"New Jersey has long espoused a policy favoring the use of consensual agreements to resolve marital controversies." Konzelman v. Konzelman, 158 N.J. 185, 193 (1999). Courts recognize the contractual nature of those matrimonial agreements. Pacifico v. Pacifico, 190 N.J. 258, 265 (2007). As contracts, PSAs should be enforced according to the original intent of the parties. Id. at 266. Therefore, as a general rule, "absen[t] . . . unconscionability, fraud, or overreaching in negotiations of the settlement," a trial court has "no legal or equitable basis . . . to reform the parties' property

21

settlement agreement." Miller v. Miller, 160 N.J. 408, 419 (1999).

PSAs, however, "must reflect the strong public and statutory purpose of ensuring fairness and equity in the dissolution of marriages." Id. at 418. As such, courts historically have maintained "[t]he equitable authority" to modify child support agreements privately reached between parties. Conforti v. Guliadis, 128 N.J. 318, 323 (1992); see also Patetta v. Patetta, 358 N.J. Super. 90, 95 (App. Div. 2003) ("While courts are predisposed to uphold property settlement agreements, this enforceability is subject to judicial supervisory control." (citations omitted)); N.J.S.A. 2A:34-23 (support orders "may be revised and altered by the court from time to time as circumstances may require"). Allowing such modification ensures that the arrangements are "fair and just" to all parties involved. See Petersen v. Petersen, 85 N.J. 638, 642 (1981).

When a party to a comprehensive negotiated PSA seeks to modify any support obligation, that party must meet the threshold standard of changed circumstances. Lepis v. Lepis, 83 N.J. 139, 146-48 (1980). Events that qualify as changed circumstances to justify an increase or decrease of support include an increase in the cost of living, an increase or decrease in the income of the supporting or supported spouse,

cohabitation of the dependent spouse, illness or disability arising after the entry of the judgment, and changes in federal tax law. Id. at 151. In addition, an increase in the needs of a child or emancipation of a child may constitute changes in circumstances that will trigger an examination of the support obligation. Id. at 151-52.

Changed circumstances are not confined to events unknown or unanticipated at the time of the agreement. Dolce v. Dolce, 383 N.J. Super. 11, 19 (App. Div. 2006). On the other hand, care must be taken not to upset the reasonable expectations of the parties. Ibid. When a PSA addresses the changed circumstance, modification of the PSA may not be equitable or fair. Lepis, supra, 83 N.J. at 153. When one or both parents have agreed to undertakings advantageous to a child beyond that minimally required, the public policy favoring stability of arrangements, see Smith v. Smith, 72 N.J. 350, 360 (1977); Dolce, supra, 383 N.J. Super. at 20, usually counsels against modification.

The threshold changed circumstances standard assumes that the parties addressed the event precipitating the application to modify provisions of a PSA. In some instances, the parties will acknowledge the existence of certain facts, express a desire to meet the needs of a child, or fashion a solution to the acknowledged issues but defer the resolution of these issues until a later date. In such a situation, the changed

circumstances standard does not operate as a threshold barrier to address the motion before the court; the guiding principle for consideration of the motion is the best interests of the child. That same principle informs consideration of a motion to modify a negotiated comprehensive PSA once the party seeking modification demonstrates changed circumstances.

VI.

A.

Statutes and case law have recognized for some time that creation of a trust to permit continuation of support of a dependent spouse or child should be permitted in appropriate circumstances. See N.J.S.A. 3B:11-36 to -37 (authorizing creation of special needs trust for disabled person); N.J.S.A. 2A:34-23 (authorizing "creation of trusts . . . to assure payment of reasonably foreseeable medical and educational expenses"); see also Jacobitti v. Jacobitti, 135 N.J. 571, 574-75 (1994) (approving creation of trust to secure spousal support). Nonetheless, this case presents our first opportunity to consider under what circumstances a parent may modify a child support obligation by establishing a special needs trust for a dependent child in place of some or all of the terms of an existing negotiated agreement.

Plaintiff's application to establish a special needs trust and to fund it with child support now payable to defendant

24

implicates certain basic principles regarding agreements that conclude a marriage and that govern the obligations and expectations of the parties to those agreements. We encourage divorcing parents to anticipate the needs of their children beyond the parents' and children's present circumstances and needs, and we must respect the reasonable expectations of the parties. On the other hand, we must guard against effectively freezing the means of providing for a child's welfare to the plan adopted at one point in time and eliminating the possibility of crafting a support scheme more responsive to the needs of an adult, disabled child. Indeed, this Court has recognized for some time that the increased needs of a child should be considered a changed circumstance. Lepis, supra, 83 N.J. at 151-52. We must also recognize that even the most thoughtful parents may not anticipate every future event. Their disabled child may or may not develop the skills required to live in an independent or semi-independent living arrangement. As the parents age, they may realize that their physical or financial resources cannot provide the level of care required by the adult, disabled child. Moreover, changes in the terms and conditions of employment of one or both parents may compromise the scheme devised years before to provide for the current and future needs of their child. Modification of a fully negotiated

agreement for the support of any adult, disabled child should not be undertaken lightly.

Thus, when parents develop a plan that addresses the needs of their child or children that may be more advantageous to the child or children as they and their parents' age, it should not be rejected out-of-hand because the parents have a negotiated plan in place. Moreover, when the parties have a fully negotiated agreement but have deferred some issues, such as payment for post-secondary education or future support for a disabled, dependent child, care must be taken that the best interests of the child standard is applied to allow full consideration of a proposal that addresses the future needs of the dependent, disabled child.

We reemphasize that "[t]he right to child support belongs to the child." Pascale, supra, 140 N.J. at 591; accord Martinetti, supra, 261 N.J. Super. at 512. The parent who receives the support is obliged to expend the funds to support the child. See J.S. v. L.S., 389 N.J. Super. 200, 205 (App. Div. 2006) ("The purpose of child support is to benefit children, not to protect or support either parent."), certif. denied, 192 N.J. 295 (2007). A special needs trust in conjunction with a thoughtful plan to gain eligibility and receipt of government benefits, including Medicaid, SSI, and Division of Developmental Disability (DDD) programs, permits a

26

family to provide health care, income, housing, and vocational services for their disabled, dependent child. The redirection of a child support obligation from a parent to a trust designed to meet the present and future needs of the dependent, disabled child should not be considered exceptional or extraordinary relief, if such a plan is in the best interests of the unemancipated child.

B.

In this matter, the original PSA deferred certain issues, such as payment of post-secondary education, and reserved the right of either party to seek appropriate relief from the court. The PSA was amended in October 2005 to incorporate certain agreements about future financial provisions for A.B. but reserved for a later date discussions about whether a life insurance trust or a special needs trust should be established for A.B. While plaintiff committed to permitting A.B. to receive post-secondary educational opportunities, he did not commit to fully fund that level of education or all future financial needs of his son. Plaintiff's application to establish a special needs trust for the future financial needs of A.B. should have been evaluated in accordance with the best interests of the child standard.

Plaintiff, however, failed to present a detailed plan by which the trial court could evaluate whether a special needs

27

trust furthers the best interests of A.B. Plaintiff presented little more than a concept. Such a sparse presentation did not permit the Family Part judge to reach an informed decision on whether continuation of the existing support provisions from the PSA are in the best interests of A.B. as he matures and moves beyond special education and transitional education programs.

Plaintiff provides $50,000 each year to defendant for the support of A.B. Plaintiff also maintains A.B.'s health insurance and holds a $2.5 million life insurance policy for A.B.'s benefit. The child support is a considerable sum of money to provide for A.B.'s current needs, and the life insurance proceeds will provide a considerable sum of money to care for A.B. on his father's death. But A.B.'s needs are also considerable, and the record contains little information that addresses the fundamental question whether the funds currently paid for his support are sufficient to meet all of his needs. The record merely suggests that gaining eligibility for government programs, such as Medicaid, SSI, and DDD, are better suited to meeting the long-term needs of A.B.

A parent seeking to alter a negotiated agreement for the financial support of a disabled child or seeking court approval of a plan to address deferred and unresolved issues concerning the support of a dependent, disabled child must present a specific plan and demonstrate how the proposed trust will

28

benefit the disabled child. At a minimum, the Family Part judge must have a complete understanding of the current physical, psychological, educational, vocational, and recreational needs of the dependent, disabled child, the cost to support those needs, and the resources available to fund those needs. If the plan relies on access to government benefits, the Family Part judge must be presented with a specific plan that addresses, among other considerations, eligibility rules, the time it will take to gain eligibility, and how long it will take to access benefits once eligibility is established. The plan must address the means of defraying current costs without compromising the child's benefits eligibility. The plan must also address the terms and conditions for disbursement of the corpus of the trust and designate a trustee.

The plan presented by plaintiff meets none of those requirements. Due to the manifest deficiencies of the application presented by plaintiff, the Appellate Division properly affirmed the order denying plaintiff's motion.

VII.

Although we have determined that plaintiff presented an inadequate plan to warrant modification or amendment of the PSA by the trial court, the record indicates that both parents recognize the wisdom of creating a plan to provide for the needs of their son now and as he and they grow older. We, therefore,

29

address whether and under what circumstances a guardian ad litem should be appointed for a dependent, disabled child who is the subject of a proposed special needs trust.

The need for an independent person to review certain applications that will affect the interests of a dependent and unemancipated child has been recognized by legislation and court rule. Our court rules contemplate the appointment of a guardian ad litem in two contexts: an action to determine the incapacity of a person, R. 4:86; and actions to resolve custody or parenting time/visitation disputes, R. 5:8B. "[T]he basic role of the guardian ad litem is to assist the court in its determination of the incompetent's or minor's best interest." Adoption of a Child by E.T., 302 N.J. Super. 533, 539 (App. Div.), certif. denied, 152 N.J. 12 (1997); accord In re M.R., 135 N.J. 155, 175 (1994).

There are other contexts in which either a law guardian will be appointed or a third party will be required to conduct an investigation to assure that the best interests of the child or children are advanced and protected. For example, a law guardian will be appointed for a child who is the subject of an abuse or neglect proceeding or a termination of parental rights proceeding. N.J.S.A. 9:6-8.21(d), -8.23; N.J.S.A. 30:4C-

30

15.4(b).[4]  In an adoption proceeding where the child is received through private placement rather than from an approved agency, an approved agency must be appointed to investigate the circumstances of the placement and to perform an evaluation of the child and the adopting parents.  N.J.S.A. 9:3-48(a)(2).[5]  No rule or statute, however, directly speaks to the situation here.

Certainly not every application affecting an unemancipated child requires appointment of a guardian ad litem.  See R. 5:8B ("In all cases in which custody or parenting time/visitation is an issue, a guardian ad litem may be appointed . . . if the circumstances warrant such an appointment." (Emphasis added)).  The decision to appoint a guardian ad litem is reposed in the discretion of the trial judge, see In re M.R., supra, 135 N.J. at 179, and rightly so because the decision is informed by the experience the judge gains as the judge sifts through a daily docket of contested matters.  A judge is also charged with protecting the best interests of a child.  The judge should not hesitate, therefore, to appoint a person to permit the

---

[4] The basic role of the law guardian is to serve as an advocate for the minor child.

[5] N.J.S.A. 2A:4A-92 also authorizes a Court Appointed Special Advocate (CASA) program in each vicinage.  See also Rule 5:8C (authorizing appointment of special advocate from CASA program to assist Family Part judge in determining best interests of child); Administrative Directive #05-13 (July 16, 2013) (noting that CASA volunteers gather information about children who have been removed from their homes due to abuse or neglect and present that information to court).

dependent, disabled child to have a voice in an application that may so fundamentally affect his or her future. In certain situations, a court-appointed expert well-versed in special needs trusts may be the appropriate response. When one parent resists an application by the other parent to establish a trust that may offer more financial security to the disabled, unemancipated child as the child matures, the judge should seriously consider resorting to the various available resources to protect the best interests of the child.

In this case, however, as plaintiff's application was presented to the court, we conclude that the trial judge did not mistakenly exercise the discretion reposed in him to appoint a guardian ad litem or other resource to investigate and report whether a special needs trust would protect and advance the best interests of A.B. The plan was entirely speculative and lacked the detail to permit an informed decision on whether it protected and advanced the best interests of A.B. When either parent submits a plan that permits an informed decision, the trial court should consider appointment of a guardian ad litem or other resource person, particularly if there is a suggestion that the parent proposing the trust is seeking to minimize the obligation to support A.B. or that defendant considers the child support currently paid to her as anything other than funds for the exclusive support of A.B.

32

## VIII.

The judgment of the Appellate Division is affirmed as modified.


CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, HOENS and PATTERSON; and JUDGE RODRÍGUEZ (temporarily assigned) join in JUDGE CUFF's opinion.

SUPREME COURT OF NEW JERSEY

NO.    A-111                            SEPTEMBER TERM 2011

ON CERTIFICATION TO        Appellate Division, Superior Court

J.B.,

        Plaintiff-Appellant,

                v.

W.B.,

        Defendant-Respondent.

DECIDED          August 20, 2013
                Chief Justice Rabner                          PRESIDING

OPINION BY        Judge Cuff (temporarily assigned)

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY

| CHECKLIST | AFFIRMED AS MODIFIED | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE HOENS | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |