# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0984-24

M.B.M.,[1]

    Plaintiff-Respondent,

v.

M.R.-L.,

    Defendant-Appellant.

_____

Submitted February 24, 2026 – Decided March 9, 2026

Before Judges Firko, Perez Friscia, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FD-11-0503-23.

Law Offices of Sklar Smith-Sklar, attorneys for appellant (Keith D. Sklar, on the brief).

Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to protect the confidentiality of the family in these proceedings. R. 1:38-3(d)(13).

Following a plenary hearing, defendant M.R.-L. appeals from the July 26, 2024 Family Part order granting the parties shared custody, designating plaintiff M.B.M. as the parent of primary residence (PPR), and ordering defendant to have supervised visitation.[2] Having reviewed the record, defendant's arguments, and applicable law, we affirm.

I.

The parties had a non-marital relationship and resided in Pennsylvania. Their son, M.E.M., was born in October 2016, and daughter, A.M., was born in October 2018. After custody proceedings in Pennsylvania, plaintiff moved to New Jersey with the children.[3]

On December 6, 2022, plaintiff filed an order to show cause (OTSC) in New Jersey seeking full custody, which was denied. On December 23, 2022, defendant filed her own OTSC in New Jersey seeking custody, which was denied. After defendant moved for a review of custody, a plenary hearing was ordered.

---

[2] Plaintiff did not file a responsive brief to this appeal.

[3] We have not been provided the Pennsylvania court orders and initial Family Part orders in this matter. See R. 2:6-1(a)(1)(I) (requiring the appellant to include in the appendix on appeal "such other parts of the record . . . as are essential to the proper consideration of the issues, including such parts as the appellant should reasonably assume will be relied on by the respondent in meeting the issues raised").

A-0984-24

At the hearing, defendant testified that her relationship with plaintiff was tumultuous. They had resided together for about one year at plaintiff's mother, A.M.G.'s, residence in Pennsylvania. Defendant asserted that in August 2019, an incident occurred while she was at a friend's house with the children. After she and plaintiff had a verbal disagreement, the police were called and she was arrested. Defendant later appeared in Pennsylvania court, and it was "agreed" that plaintiff would have the children for ninety days. She believed that "the kids were going to be returned to" her upon completion of "a drug test." Defendant maintained that in March 2021, plaintiff "absconded" to Trenton with the children without informing her or the Pennsylvania court.

At the hearing, which spanned several days over four months in 2024, defendant produced social media photographs that she represented evinced inappropriate conduct of plaintiff smoking marijuana and gesturing with his hand to mimic a handgun. She maintained plaintiff was not taking care of A.M. because she was "urinating on herself," and the children were dirty and injured when in his care. Defendant alleged plaintiff refused her continued attempts to have visitation with the children in 2022 and 2023. In January 2023, defendant went to Paul Robeson Elementary School to obtain school records for M.E.M. but the school denied her any information, believing the parties had a restraining order. She testified there was never a restraining order and the school called

3

A.M.G. to pick up the children. Defendant relayed that when she went to the school again in May 2023, attempting to "talk to the principal and teachers," the school called the police. Regarding the school's emergency contact information, defendant maintained that plaintiff "never told the school [she] existed."

Defendant asserted A.M.G. primarily watched the children and that plaintiff was "affiliated with gangs," was a member of a "drag-racing team," and put the "children in jeopardy." She represented that plaintiff had multiple motor vehicle infractions, had charges for eluding the police, and did not have a valid driver's license. Defendant acknowledged she did not have a driver's license.

Defendant asserted on Easter, March 31, 2024 (Easter incident), she received an anonymous call advising that the children were at a park "in danger." She travelled from Pennsylvania to a New Jersey park with other people and "grabbed" the children after she observed they were with A.M.G. Later that evening, she returned the children to plaintiff after the police became involved. Before returning the children, defendant bathed them and took pictures of their "private" areas as well as other body parts, believing they were injured and dirty. She introduced photographs of the children that she maintained depicted dirt, warts, bruising, and other various injuries. After contacting the Division of Child Protection and Permanency (DCPP) an investigation occurred, and she later learned "the case was closed."

4

Defendant explained she lived in a nice home in Pennsylvania with her partner, D.B., and that the children had their own rooms. Her home was about fifteen to twenty minutes away from plaintiff's house. She was concerned that M.E.M. was not receiving speech therapy for a speech impediment and A.M. was not in therapy because she was born "a preemie."

On cross-examination, defendant admitted that during the Easter incident she was wearing an Easter bunny costume. She alleged that the anonymous caller gave her the exact location where the children were. She did not see plaintiff or view her children in any danger but had decided to take them. Regarding plaintiff's custody of the children, she alleged he fabricated a letter from Pennsylvania Child Protective Services (CPS), which stated that she could not have the children.[4] She maintained the listed individuals on the letter did not exist and she obtained a contradictory letter from CPS. Defendant admitted she would go to plaintiff's residence and place of employment without contacting him.

Defendant explained the parties appeared in Pennsylvania court in 2018. The parties later "failed . . . drug test[s]" and in 2019, the Pennsylvania court ordered defendant to have supervised visitation. The parties also received "Conciliation and Evaluation Services" in Pennsylvania. Defendant maintained

---

[4] Defendant has not provided the referenced letters on appeal. R. 2:6-1(a)(1)(I).

A-0984-24

that from "2021 to 2023" her "mom," J.A., and "sister" "supervised [her] visitation."

Defendant called Trenton Police Department Detective Ryan Hornberger as a witness. He testified that on October 30, 2022 (Halloween incident), he was dispatched to plaintiff's home regarding a visitation dispute. After learning defendant was supposed to have the children for Halloween, he tried to assist in resolving the dispute because plaintiff requested defendant write a note for the school, to explain the upcoming absences. Hornberger stated that defendant maintained she had not seen the children "in a few months" and plaintiff declined assistance because he "wanted it to all be handled through the court." Later, in March 2023, Hornberger was again involved with the parties over a visitation dispute and recalled plaintiff "did not want to . . . cooperat[e] in the matter."

J.A. testified that defendant and the children briefly lived with her. She corroborated that the children have not lived with defendant since 2019. J.A. explained that when defendant had the children for visitation, J.A. observed they were "full of bruises" and "smelled . . . like a pet." She believed plaintiff had "threatened" defendant and "did not want [the] children to be back with her." J.A. expressed that the children "were happy" when with defendant. On cross-examination, J.A. admitted the police arrested her and defendant in

Pennsylvania because plaintiff's "neighbors believe[d] that [they] were kidnapping the children."

D.B. testified he had been dating defendant for about five years and that they were currently living together in a three-bedroom house. He stated the children were dirty and would smell after they were in plaintiff's care. He explained the children were "overjoyed" when with defendant. "In [his] opinion, [defendant] was the best mother [the] kids could have." Regarding the Halloween incident, he recalled the police were called after plaintiff refused to exchange the children. He also recounted that during a visit to the elementary school, a school official expressed concerns over an allegedly existing restraining order and a DCPP investigation. D.B. asserted plaintiff moved to Trenton in 2021. Regarding the Easter incident, he admitted they "took" the children and had intended to "assess . . . a plan of action" after examining the children for injuries.

A.M.G. testified that after A.M. was born, the children began to live with her and plaintiff in Pennsylvania. She maintained plaintiff had received the children in January 2019, after CPS became involved. A.M.G. asserted plaintiff has "been the one with the children all this time" and that she "t[oo]k[] care of the children during the day." She relayed plaintiff worked as a mechanic and was a manager at Toyota. She believed the children's school needs were met

and they were "playful." Regarding the parties' involvement with the police, she recounted that the police were called several times after defendant came to their house.

She recalled that during the Easter incident, defendant came to the park in an Easter bunny costume and "took the children by force" with a "posse." After detectives investigated, A.M.G. believed they found "a GPS [tracking device] underneath [her] car" and retained it for evidence. Plaintiff's counsel offered a video recording of the Easter incident, which the court noted depicted yelling and screaming.[5]

On cross-examination, A.M.G. denied ever telling the school there was a restraining order. She also recalled that defendant had infrequently seen the children since 2022. A.M.G. was adamant the children suffered no mistreatment in plaintiff's care but conceded at times they got hurt. She conceded eleven people lived in the Trenton home, which she maintained had four-and-a-half bedrooms.

Plaintiff testified that he obtained an associate's degree in automotive specialized technology and was a vehicle dealership service manager. He explained he had used drugs in the past but stopped and was not involved in drag racing. Plaintiff recounted he received a call from CPS in January 2019 and was

---

[5] Defendant has not provided the referenced video on appeal. R. 2:6-1(a)(1)(I).

instructed that he had to pick up his children or they would be placed in foster care. He maintained that, in 2019, defendant was a "stripper" and kept moving with the children, creating instability. When defendant received the children, he immediately ensured they received standard preventative medical care. Plaintiff explained he moved because the landlord for his Pennsylvania home decided to sell the property. He moved with A.M.G. to Trenton after they located a rental house. He asserted his attorney was advised about the move, and the attorney notified the Pennsylvania court. After defendant later moved to her new home, plaintiff conceded the updated travel time between their residences increased to about forty-five minutes.

Plaintiff acknowledged that the Pennsylvania court required the parties to have supervised visitation for a period of time. He conceded A.M.G. underwent a drug test to become his parenting supervisor. Defendant's parenting time was supervised by J.A., D.B., and her sisters. Plaintiff acknowledged there was an order requiring him to be drug tested in April 2020, but he did not complete the test.

He also admitted having prior motor vehicle tickets but maintained he was not arrested and had restored his driver's license. Plaintiff relayed the children were in school and involved in activities. Regarding the Easter incident, he explained he had gone to drop off his girlfriend and, "in the snap of a finger,"

A-0984-24

defendant removed the children. He also relayed that during the Halloween incident, he had asked defendant to write a note for the school because they would miss school days and he did not want any issues.

Regarding DCPP's involvement, plaintiff asserted defendant called multiple times reporting that the children were in need of assistance but after each investigation there were only "negative" findings. Plaintiff maintained defendant had supervised visitation from 2019 through 2022. He asserted that he was agreeable to defendant having visitation with parameters.

On cross-examination, plaintiff admitted the police in Pennsylvania charged him on December 30, 2023 with eluding police and resisting arrest. He also acknowledged that A.M.G. watched the children while he was working. Regarding bathing and examining his children, he explained he did not feel comfortable looking at A.M.'s private areas, so he relied on his mother. He also admitted the children at times got bruises and scratches, recalling that M.E.M. was injured in a bouncy house after he brought in a windshield ice scraper. Further, plaintiff acknowledged sharing a bedroom with his children in the Trenton house.

After the hearing, the court issued an order accompanied by a ninety-page oral decision. The court awarded the parties joint legal custody and designated plaintiff as the PPR. Defendant was ordered to have continued supervised

parenting time and was required to pay any costs associated with facilitating the supervision. The court required the parties to "enroll in a parenting skills program and complete the course." The court also retained jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), N.J.S.A. 2A:34-53 to -95, and prohibited the parties from relocating with the children from New Jersey without a further court order.

The court was unpersuaded by defendant's argument that plaintiff violated Pennsylvania's and New Jersey's anti-removal statutes because a November 2021 Pennsylvania court order "acknowledg[ed] that . . . [plaintiff] had relocated to New Jersey with the children" and there was no subsequent order awarding defendant custody. Regarding credibility, the court found both plaintiff and A.M.G. credible, but determined defendant lacked credibility at times during her testimony. It specifically found defendant's testimony regarding the Easter incident was inconsistent and the video depicting her conduct was relevant because it showed that defendant "grabbed" the children from the park. The court was "deeply concerned" by defendant's actions of going to the park in an Easter bunny costume and that D.B. carried M.E.M. off screaming and crying. Regarding defendant's photographs of the children in allegedly unhealthy conditions, the court found they were "not impactful" because the DCPP investigations revealed no concerns with the "safety and care of the children."

A-0984-24

The court considered each factor enumerated in N.J.S.A. 9:2-4(c) in evaluating the children's best interests. The court found certain factors more relevant. Under factor one, the court determined the parties had "no ability to agree" or "communicate." In considering factor three, the court found defendant's relationship with her children was "problematic" based on her actions. The court was satisfied under factors seven, eight, and nine, that plaintiff was meeting the children's needs as "reflected in the DCPP report," demonstrated a stable home, and was attending "to their education." Regarding geographical proximity, the court determined the distance between the parents' homes in "Northeast Philadelphia and Trenton" was not a great burden on the parenting exchanges. With respect to defendant's fitness to parent under factor ten, the court had serious concerns regarding defendant's conduct "over the course of many years." The court found defendant's resort to "self-help as to unsupervised visitation" during the Easter incident was a violation of the prior court orders. It determined that defendant, after two months had passed and following the completion of parenting classes, could seek "unsupervised parenting time." After fully considering the issues, the court determined defendant failed to demonstrate a change of circumstances warranting a modification of custody and visitation. This appeal followed.

On appeal, defendant contends the court erred in ordering that plaintiff would be the PPR of the children as its decision is unsupported "by any evidence."

II.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "Appellate courts accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412); see also Hand v. Hand, 391 N.J. Super. 102, 111 (App. Div. 2007) (stating that because of Family Part judges "special expertise in family matters, we do not second-guess their findings and the exercise of their sound discretion"). "We review questions of law, including the issue of statutory interpretation, de novo." Amzler v. Amzler, 463 N.J. Super. 187, 197 (App. Div. 2020).

A decision concerning custody and parenting time rests in "the sound discretion of the trial courts." Pascale v. Pascale, 140 N.J. 583, 611 (1995). "We defer to the trial judge whether a plenary hearing must be scheduled." Jacoby v. Jacoby, 427 N.J. Super. 109, 123 (App. Div. 2012). In "reviewing decisions granting or denying applications to modify child support, we examine

whether, given the facts, the trial judge abused his or her discretion." J.B. v.

W.B., 215 N.J. 305, 325-26 (2013) (quoting Jacoby, 427 N.J. Super. at 116).

"[I]n custody cases, it is well settled that the court's primary consideration

is the best interests of the children." A.J. v. R.J., 461 N.J. Super. 173, 181 (App.

Div. 2019) (quoting Hand, 391 N.J. Super. at 105). "A party seeking to modify

custody must demonstrate changed circumstances that affect the welfare of the

children." Hand, 391 N.J. Super. at 105. "Where there is already a judgment or

an agreement affecting custody in place, it is presumed it 'embodies a best

interests determination' and should be modified only where there is a 'showing

[of] changed circumstances which would affect the welfare of the child[].'" A.J.,

461 N.J. Super. at 182 (first alteration in original) (quoting Todd v. Sheridan,

268 N.J. Super. 387, 398 (App. Div. 1993)). To determine whether the requisite

changed circumstances exist, the court must consider the circumstances that

existed at the time the current order was entered. See Beck v. Beck, 239 N.J.

Super. 183, 190 (App. Div. 1990); see also Donnelly v. Donnelly, 405 N.J.

Super. 117, 127-29 (App. Div. 2009).

The UCCJEA controls a court's jurisdiction for child custody

determinations, including modifications of visitation and parenting time.

N.J.S.A. 2A:34-54; see also Griffith v. Tressel, 394 N.J. Super. 128, 137 (App.

Div. 2007). A court that has made an initial child custody determination "has

exclusive, continuing jurisdiction" over the determination and modifications until:

> (1) a court of this State determines that neither the child, the child and one parent, nor the child and a person acting as a parent have a significant connection with this State and that substantial evidence is no longer available in this State concerning the child's care, protection, training, and personal relationships; or
>
> (2) a court of this State or a court of another state determines that neither the child, nor a parent, nor any person acting as a parent presently resides in this State.
>
> [N.J.S.A. 2A:34-66(a)(1) to (2).]

"'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." N.J.S.A. 2A:34-54.

In accordance with N.J.S.A. 9:2-2, trial courts are required to find "a showing of 'cause' before a court will authorize the permanent removal of a child to another state without the consent of both parents or, if the child is of 'suitable age' to decide, the consent of the child." Bisbing v. Bisbing, 230 N.J. 309, 323 (2017). The Supreme Court in Bisbing recognized "the 'growing trend in the law easing restrictions on the custodial parent's right to relocate with the children and recognizing the identity of interest of the custodial parent and child.'" Id. at 326 (quoting Baures v. Lewis, 167 N.J. 91, 109 (2001)). A court "should conduct a best interests analysis to determine 'cause' under N.J.S.A. 9:2-

15

2 in all contested relocation disputes in which the parents share legal custody—whether the custody arrangement designates a [PPR] and a parent of alternative residence, or provides for equally shared custody." Id. at 335.

When "making an award of custody," courts must consider the following fourteen factors under N.J.S.A. 9:2-4(c) in a best interests analysis:

> [(1)] the parents' ability to agree, communicate and cooperate in matters relating to the child; [(2)] the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; [(3)] the interaction and relationship of the child with its parents and siblings; [(4)] the history of domestic violence, if any; [(5)] the safety of the child and the safety of either parent from physical abuse by the other parent; [(6)] the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; [(7)] the needs of the child; [(8)] the stability of the home environment offered; [(9)] the quality and continuity of the child's education; [(10)] the fitness of the parents; [(11)] the geographical proximity of the parents' homes; [(12)] the extent and quality of the time spent with the child prior to or subsequent to the separation; [(13)] the parents' employment responsibilities; and [(14)] the age and number of the children.

Courts must also "identify on the record the specific factors that justify the arrangement." See J.G. v. J.H., 457 N.J. Super. 365, 374 (App. Div. 2019) (quoting Bisbing, 230 N.J. at 322).

A-0984-24

III.

Defendant contends reversal is warranted because the court erroneously maintained "the status quo" by ordering plaintiff to continue as the PPR and for her to have supervised visitation with the children. She also argues the court erred by "fail[ing] to enforce the UCCJEA" because plaintiff was permitted to "flee" Pennsylvania's jurisdiction and orders. After a review of the record, we affirm.

We first address defendant's contention that the court abused its discretion by not finding plaintiff violated Pennsylvania's orders by relocating to New Jersey. While defendant has failed to provide the relevant Pennsylvania orders referenced, we are not inhibited from a meaningful appellate review because the court recited the portions of the order it relied on. The court explained that the November 1, 2021 Pennsylvania "domestic court sheet" noted plaintiff resided in New Jersey. Further, the Pennsylvania order required defendant to advise "the welfare office" "that the children were residing in New Jersey." The court highlighted the order referenced that the parties had placed their agreement on the record the same day. The court had requested defendant provide a transcript of the Pennsylvania court's November 1, 2021 proceeding but she never complied. We are unpersuaded by defendant's argument that the court should have designated her as the PPR because she demonstrated the case "was really

17

about [plaintiff's] fleeing . . . and not doing what [wa]s required of him in order to relocate."

Relevantly, defendant acknowledged the parties agreed, in 2019, that plaintiff would have residential custody of the children after CPS became involved and she had tested positive for using controlled dangerous substances. Her argument that plaintiff was only "temporarily" awarded custody for ninety days is unsupported by the record. She produced no order giving her custody of the children. While defendant maintains plaintiff unlawfully moved to Trenton around March 2021, she offers no explanation as to why the November 2021 Pennsylvania order references plaintiff's New Jersey move and an agreement between the parties. Moreover, her vague testimony that she filed multiple Pennsylvania court applications seeking to find plaintiff in violation of Pennsylvania's anti-removal statute and to change custody is uncorroborated by any evidence. For these reasons, we discern the court did not abuse its discretion in finding the Pennsylvania order acknowledged plaintiff's relocation with the children to New Jersey and no subsequent order awarded defendant custody.

We next address defendant's argument that no evidence supports the court's order continuing plaintiff as the PPR and requiring defendant to have supervised visitation. The court specifically found defendant lacked credibility and expressed serious concerns over her behavior. Substantial evidence in the

18

record supports the court's concerns and determination that it was "inconceivable and not credible that [defendant] would travel from Philadelphia in an Easter bunny outfit and try to determine whether her children were safe."

Further, after thoroughly reviewing each factor under N.J.S.A. 9:2-4(c), the court found defendant failed to demonstrate a warranted change of circumstances and determined it was in the children's best interests to stay with plaintiff. In ultimately determining that plaintiff "would provide a more stable home environment" for the children, the court found it relevant that DCPP found no issues with the children's welfare, the children were in school, and their needs were being met. We discern no error in the court finding that defendant should have supervised visitation and permitting her to move to "file a subsequent application seeking unsupervised parenting time" after completing the imposed conditions. Substantial credible evidence in the record supports the court's finding that "the prior [o]rders entered by Pennsylvania courts providing . . . plaintiff with primary residential custody . . . shall be maintained."

To the extent not addressed, defendant's remaining contentions lack sufficient merit to warrant discussion in our written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0984-24