**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5308-18T3

P.J.W.,

      Plaintiff-Respondent/
Cross-Appellant,

v.

E.B.W.,

      Defendant-Appellant/
Cross-Respondent.

_____

      Argued September 22, 2020 – Decided November 16, 2020

      Before Judges Gilson, Moynihan, and Gummer.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0298-12.

      Richard S. Diamond argued the cause for appellant (Diamond & Diamond, P.A., attorneys; Richard S. Diamond, Lynn Matits Gianforte, and Samuel J. Berse, on the briefs).

      Andrew M. Shaw argued the cause for respondent.

PER CURIAM

This appeal involves disputes concerning alimony, child support, and attorney's fees that arose after the parties were divorced. Defendant, the former wife, appeals from a June 28, 2019 order that reduced the former husband's alimony obligations due to a change of employment and a related reduction in his compensation.[1] Plaintiff cross-appeals from the same order, contending that his child-support obligation should have ended when their unemancipated child came to live with him and that he was entitled to reimbursement for child support paid while the child was living with him. He also challenges the denial of his request for attorney's fees.

The order being appealed was entered after a plenary hearing. Having reviewed the extensive record and applicable law, we discern no error in the decisions concerning alimony and attorney's fees. We reverse the provision of the order concerning child support because the family court failed to set forth its findings of fact and conclusions of law on that issue. Accordingly, we remand that issue.

---

[1] We use initials in the caption to protect the privacy of the litigants and preserve the confidentiality of certain records because we discuss some of their financial circumstances. See R. 1:38-3(d).

I.

The parties were married in 1993 and, twenty years later, in 2013 they divorced. They have two children: a son who is emancipated and a daughter who was born in January 2001 and is currently attending college.

Plaintiff filed for divorce in 2011. After two years of litigation, the parties negotiated and entered into a Support and Equitable Distribution Agreement (the Support Agreement), which was incorporated into their final judgment of divorce. Under the Support Agreement, plaintiff agreed to pay defendant permanent alimony "consisting of 25% of husband's total gross compensation up to a total of [$]1,250,000.00 per annum."

At the time of the divorce, plaintiff was a senior executive at Barclays Bank (Barclays). His total gross compensation in the last four years of the marriage averaged over $910,000. Plaintiff received various forms of compensation, some of which were fixed and some of which were discretionary or based on his performance. The parties agreed that plaintiff would pay twenty-five percent of his fixed compensation of $420,000 (that was $105,000) in bi-monthly payments of $4375. Plaintiff was also obligated to pay defendant twenty-five percent of his remaining gross compensation within five business days of his receipt of such additional compensation. The Support Agreement

3

also provided that either party could seek to modify the alimony if there was a "material change" in his or her financial circumstances.

In addition, the Support Agreement required plaintiff to pay defendant child support. Like alimony, plaintiff paid child support in fixed and variable amounts. The Support Agreement provided that when their son started college, plaintiff would make a monthly payment of $880 based on his fixed income of $420,000. Plaintiff was also required to make additional child-support payments of four percent of his gross compensation above $420,000. Additionally, plaintiff was responsible for paying 72.5% of the children's various expenses, including extracurricular and college expenses.

Plaintiff has a master's degree in computer science and has held a variety of positions dealing with computer technology applied to finance. In 2008, plaintiff became a senior executive at Barclays, where he was responsible for managing the bank's electronic trading. In 2013, he held the position of Managing Director of Capital Markets Technology for Barclays.

In the five years following the parties' divorce (2013 to 2017), plaintiff's annual income from Barclays ranged between just over $714,000 to just over $973,000. Accordingly, his annual income from Barclays averaged over

4

$850,000 per year. Through 2016, plaintiff paid defendant alimony in the amount of twenty-five percent of his gross compensation.

In October 2017, plaintiff was notified that he was being fired from Barclays effective January 5, 2018. Plaintiff began to search for a new job and in February 2018 accepted a position as Director of Software Engineering for AlphaPoint, a start-up blockchain company. His base annual salary at AlphaPoint was $200,000, with the potential for bonuses.

In April 2018, plaintiff moved to reduce his alimony and child support based on his decreased income. The family court found that plaintiff had made a prima facie showing of a change of circumstances, authorized the parties to conduct discovery, and scheduled the matter for a plenary hearing.

Thereafter, both parties engaged in discovery and retained employment experts. The plenary hearing began in March 2019.

Meanwhile, plaintiff reinitiated his search for employment. In April 2019, plaintiff left AlphaPoint and accepted the position of Capital Markets Technology Manager with Wells Fargo Bank. Plaintiff's annual salary at Wells Fargo is $265,000, and he has the potential for bonuses and stock options. Plaintiff continued to work for Wells Fargo through June 2019, when the family court issued the order on appeal.

A-5308-18T3

After plaintiff took the position with Wells Fargo, the family court allowed the parties to engage in supplemental discovery. Each employment expert submitted an additional report addressing plaintiff's employment at Wells Fargo.

As already noted, the plenary hearing began in March 2019 and was conducted on five days between March and June 2019. The family court heard testimony from both parties and their employment experts. Plaintiff's expert was Dr. Daniel Wolstein, and defendant's expert was Dr. David Stein.

Plaintiff testified that he conducted his post-Barclays employment searches in two phases: (1) October 2017 into February 2018; and (2) December 2018 into April 2019. He explained that he used recruiters, his professional network, and directly applied to positions posted on the internet. Between October 2017 and February 2018, he applied for over thirty positions and received three offers with salaries ranging between $120,000 to $200,000.

Plaintiff accepted the position at AlphaPoint in February 2018. He testified that AlphaPoint offered $40,000 more than other companies with which he had interviewed, and he believed that the position would allow him to get back into software development.

In December 2018, plaintiff reinitiated his search for employment and applied for over 100 potential positions. He was offered two: a position at Wells Fargo and a position at Amazon. He accepted the position at Wells Fargo because it had a higher base salary of $265,000 and the potential for bonuses and stock options.

Dr. Wolstein opined that plaintiff's efforts to obtain employment were reasonable and that plaintiff was being "well compensated for his skill set" in a growing industry. By contrast, Dr. Stein asserted that plaintiff had not engaged in good-faith employment searches. Dr. Stein also opined, in a written report, that the position at AlphaPoint may have negatively impacted plaintiff's chances of finding employment comparable to his position at Barclays.

In addition to his job searches, plaintiff testified about the parties' negotiation of the Support Agreement. He stated that the parties had exchanged nearly thirty drafts of the Support Agreement. He also testified that he understood the Agreement to require him to pay twenty-five percent of his total gross compensation in alimony no matter where he worked. He acknowledged, however, that defendant and her counsel did not discuss with him or his counsel whether the twenty-five-percent formula would apply to future "fluctuations" in his income.

Defendant testified that the twenty-five-percent formula in the Support Agreement was related to plaintiff's employment at Barclays. Accordingly, she maintained that the twenty-five-percent formula was not intended to apply to other employment.

Defendant also described her background and limited employment history. She has a GED, and during most of the parties' marriage she managed the marital home and cared for their children. Her last full year of outside employment was in 1996, and since then she has only worked periodically. Plaintiff also testified about the marital lifestyle and her current lifestyle expenses.

After hearing the testimony and considering the exhibits submitted into evidence, the family court rendered an oral decision on June 28, 2019. That same day, the family court issued an order that (1) granted plaintiff's motion to modify his alimony obligations by requiring plaintiff to pay twenty-five percent of his salary and bonuses based on his compensation from Wells Fargo, effective June 28, 2019; (2) denied plaintiff's request to retroactively adjust the alimony he had already paid and to reimburse him for alleged overpayments of support; (3) denied defendant's request to dismiss plaintiff's application for failure to show a change of circumstances; (4) denied both parties' request for counsel

A-5308-18T3

fees; and (5) denied plaintiff's request to modify child support. The order did not expressly address child support, but paragraph eight stated all other relief requested that was not addressed was denied.

In its oral decision, the family court found that plaintiff had been involuntarily fired from Barclays in October 2017. Plaintiff thereafter undertook job searches, which the family court found "to be sincere, to be honest and to be credible." The family court accepted plaintiff's testimony about why he initially stopped searching for a job after accepting the position at AlphaPoint. The family court also accepted plaintiff's testimony as to why he resumed his search in December 2018. The family court ultimately found that plaintiff's job searches were conducted in good faith and that he had accepted the job at Wells Fargo to maximize his income.

The family court also considered the testimony and reports of both employment experts. The court credited both experts' opinions but did not accept one opinion over the other. Instead, the family court relied on plaintiff's testimony that he had engaged in earnest, good-faith job searches and accepted the position at Wells Fargo as the best he could find.

Turning to how alimony should be calculated, the family court examined the Support Agreement and considered both parties' testimony about its

provisions. The family court found that there had been extensive efforts to negotiate the twenty-five-percent formula. The family court then reviewed the language in the Support Agreement and held that the formula was not expressly limited to plaintiff's employment at Barclays. Consequently, the family court construed the Support Agreement to mean that plaintiff was to pay alimony based on twenty-five percent of his total gross compensation no matter the source of that compensation.

In making that holding, the family court found defendant's testimony concerning her understanding of the Support Agreement not credible. The family court also found that neither party could maintain the marital lifestyle given plaintiff's reduced income. Furthermore, the family court found that while defendant had overstated many of her current expenses, applying the twenty-five-percent formula would be equitable because defendant would still be able to maintain a reasonable lifestyle.

The family court also rejected defendant's arguments that plaintiff had not established a change of circumstances. In that regard, the family court considered our decision in Storey v. Storey, 373 N.J. Super. 464 (App. Div. 2004) and determined that principles from that opinion were inapplicable

10

because plaintiff had "made every effort to maximize his earning capacity" and was not willingly underemployed.

Addressing counsel fees, the family court found that neither party acted in bad faith. The court identified the factors to be considered in a fee application under Rule 5:3-5(c) and found that they did not support an award to either party.

Finally, the family court did not make findings of fact or conclusions of law concerning child support. Instead, after making the rulings concerning alimony and counsel fees, counsel for plaintiff asked about child support. In response, the family court stated:

> THE COURT: I did not and I specifically did not do that. Given -- given the circumstances and the payments, I'm going to deny any request for the modification of child support.

## II.

Both parties appeal from certain provisions of the June 28, 2019 order. In her moving brief, defendant raises two issues, contending that the family court erred in (1) finding plaintiff had established a change of circumstances warranting a downward modification of alimony; and (2) using the twenty-five-percent formula in the Support Agreement to calculate the new alimony. Defendant raised two additional issues in her reply brief, arguing that the family

11

court erred in (3) denying her request for attorney's fees; and (4) not compelling plaintiff to pay her $61,750 in unpaid alimony and $7,275 in unpaid child support allegedly owed in 2017.

In his cross-appeal, plaintiff challenges two rulings, arguing that the family court erred in (1) denying his request to terminate child support, denying his request for reimbursement of child support he paid after their daughter came to live with him, and requiring him to continue paying child support; and (2) denying his request for attorney's fees.

A.  Our Standard of Review

The scope of our review of an order issued by the family court following a plenary hearing is limited.  Cesare v. Cesare, 154 N.J. 394, 411-13 (1998).  We will not disturb the factual findings made if they are supported by substantial, credible evidence in the record.  MacKinnon v. MacKinnon, 191 N.J. 240, 253-54 (2007) (citing N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)).  We review legal conclusions on a de novo basis.  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

B.  Alimony

Several well-established principles govern whether a court should modify or terminate alimony.  First, if the parties agreed to the amount and conditions

of alimony, that agreement should be enforced like any other settlement agreement. Quinn v. Quinn, 225 N.J. 34, 44-46 (2016). "A settlement agreement is governed by basic contract principles." Id. at 45 (citing J.B. v. W.B., 215 N.J. 305, 326 (2013)). Accordingly, a court's role is to "discern and implement the intentions of the parties" as expressed in the agreement. Ibid. (citing Pacifico v. Pacifico, 190 N.J. 258, 266 (2007)).

Second, unless the parties have agreed otherwise, alimony "may be revised and altered by the family court from time to time as circumstances may require." N.J.S.A. 2A:34-23. To justify a modification or termination, the moving party must show "changed circumstances." Lepis v. Lepis, 83 N.J. 139, 146 (1980). In Lepis, the Court recognized a non-exhaustive list of factors that give rise to changed circumstances warranting modification or termination of alimony. Id. at 151-52. Similarly, in N.J.S.A. 2A:34-23(j) and (k), the Legislature identified factors a court needs to consider when a party seeks to modify alimony. Those factors include, among other things, the financial circumstances of the parties; whether the change in circumstances is temporary or permanent; whether the change was voluntary; whether it was motivated by bad faith or a desire to avoid payment; and whether the change in circumstances renders the payor unable to meet the alimony obligation. Ibid.; see also Lepis,

83 N.J. at 151-52; <u>Larbig v. Larbig</u>, 384 N.J. Super. 17, 22-23 (App. Div. 2006); <u>Glass v. Glass</u>, 366 N.J. Super. 357, 370-71 (App. Div. 2004).

### 1.    The Change in Plaintiff's Employment

It is undisputed that in October 2017 plaintiff was involuntarily fired from Barclays. The first question is whether the twenty-five-percent formula in the Support Agreement applies to plaintiff's new employment. Defendant argues no, contending that the twenty-five-percent formula was only intended to apply to plaintiff's employment at Barclays. By contrast, plaintiff argues yes, the formula does apply and was not restricted to his employment and compensation from Barclays.

This first question is an issue of law involving the interpretation of the Support Agreement. Accordingly, we review it de novo. <u>Kieffer v. Best Buy, Inc.</u>, 205 N.J. 213, 222 (2011); <u>see also</u> <u>Quinn</u>, 225 N.J. at 45. We start with the plain language in the Support Agreement. It required plaintiff to pay defendant "'permanent alimony' consisting of 25% of husband's total gross compensation up to a total of [$]1,250,000.00 per annum." The Support Agreement goes on to discuss plaintiff's employment at Barclays and the various components of his compensation. In the "Permanent Alimony" section there are numerous sub-

provisions addressing how plaintiff's compensation from Barclays would be calculated and how the twenty-five percent in alimony would be paid.

The Support Agreement also expressly recognized that plaintiff's gross compensation and the corresponding alimony would fluctuate:

> Husband's compensation plan benefits in excess of [$]1,250,000.00 per annum shall not be subject to alimony. Notwithstanding wife's entitlement under this Agreement to support up to [$]1,250,000.00 of husband's total annual compensation, the parties acknowledge that husband did not earn [$]1,250,000.00 in any year of the parties' marriage and that wife's entitlement to share in husband's income reflects wife's willingness to agree to a formula for support instead of a flat figure each year.

In addition, the Support Agreement recognized that alimony was to be paid for years, and that the circumstances of the parties could change:

> Notwithstanding the support provisions set forth above, nothing shall prevent either party from making application to the court in the future as a result of a material change in his/her financial setting. As to same, husband views a material change in circumstance as a good faith early retirement and wife objects to any early retirement by Husband. As such, the issue of retirement shall abide the event.

On its face, the alimony provisions in the Support Agreement are not limited to plaintiff's employment at Barclays. We agree with the family court that there is nothing in the Agreement restricting the twenty-five-percent

formula to plaintiff's employment at Barclays. Moreover, we agree with the family court that the twenty-five-percent formula was the result of good faith negotiations and is enforceable as part of the parties' Support Agreement. See, e.g., Quinn, 225 N.J. at 44; Konzelman v. Konzelman, 158 N.J. 185, 194 (1999).

Given our interpretation of the Support Agreement, plaintiff did not need to show a change of circumstances. Nevertheless, even if plaintiff had to show such a change, the factual findings made by the family court establish that plaintiff showed a change of circumstances warranting a reduction in his alimony obligation. There is no dispute that plaintiff was fired from his job at Barclays. Thus, he lost the position that was compensating him over $900,000 per year.

2. Whether Plaintiff is Underemployed

While the Support Agreement is an enforceable settlement agreement, it must still be equitably applied. See Petersen v. Petersen, 85 N.J. 638, 646 (1981). In that regard, courts should enforce the contract the parties negotiated, so long as it is not inequitable or unfair. Id. at 645-46. Accordingly, if a party with a support obligation is voluntarily underemployed, the family court may impute income to that party for purposes of calculating support. See, e.g.,

A-5308-18T3

Caplan v. Caplan, 182 N.J. 250, 268 (2005); see also Elrom v. Elrom, 439 N.J. Super. 424, 434 (App. Div. 2015).

Thus, the second issue is whether plaintiff is voluntarily underemployed in his position at Wells Fargo. That is a factual question, and we therefore defer to the family court's factual and credibility findings.

The family court found that plaintiff engaged in good-faith employment searches and took the position at Wells Fargo to maximize his income. Defendant vigorously disputes those findings, contending that plaintiff's employment at AlphaPoint and Wells Fargo were not reasonable; plaintiff did not demonstrate that he engaged in legitimate employment searches; and plaintiff was underemployed. We reject all those arguments because the family court's findings are supported by substantial credible evidence. In particular, the family court relied on plaintiff's testimony, which the family court found credible. It is not within our scope of review, nor do we discern a basis, to disagree with the family court's findings.

Defendant relies on our decision in Storey v. Storey, 373 N.J. Super. 464, 468 (App. Div. 2004), to contend that plaintiff is voluntarily underemployed. In Storey, the husband was obligated to pay alimony based on his employment as a computer hardware specialist earning approximately $111,000 per year. The

husband lost that job and decided to become a massage therapist, earning $300 per week. The family court granted the husband's application to modify his support, but imputed earnings of $60,000 based on then-prevailing wages for computer service technicians and reduced his alimony obligation from $480 per week to $280 per week. Ibid. We reversed, holding an obligor's employment decision must be reasonable and outlining factors that should be considered in determining whether an obligor is voluntarily underemployed. Id. at 469-73. Accordingly, if an obligor selects a less lucrative career, he or she must establish the benefits derived from that career change substantially outweigh the disadvantage to the supported party. Ibid. Absent such a showing, earnings "consistent with the obligor's capacity to earn in light of the obligor's background and experience" should be imputed. Id. at 469.

The facts in Storey are distinguishable from plaintiff's situation. As previously noted, the family court expressly found that plaintiff had engaged in good-faith efforts to obtain new employment maximizing his compensation. Consequently, plaintiff was not found to be underemployed.

In summary, we affirm the provisions of the June 28, 2019 order applying the twenty-five-percent formula to plaintiff's compensation from his position at Wells Fargo. We also note that plaintiff disclosed that he would receive various

payouts from Barclays for several years and that he agreed to pay twenty-five percent of that compensation in alimony to defendant.

### C. Child Support

At the time of their divorce, defendant had residential custody of both children. After their son went to college, the Support Agreement provided plaintiff would continue to pay defendant child support for their daughter.

In his motion to reduce his support obligations, plaintiff represented that their daughter had been residing with him since April 2018. He sought to terminate his child-support obligation and recover the child support that he continued to pay after he filed the motion. In an order issued on June 15, 2018, the family court denied plaintiff's application without prejudice and stated that it would address the issue at the plenary hearing.

At the plenary hearing, defendant acknowledged that their daughter began living with plaintiff sometime before her senior year of high school. She went on to testify, however, that their daughter was with her every day and that she made their daughter dinner and took her to appointments.

The family court did not make findings of fact or conclusions of law concerning plaintiff's application to terminate his child support obligation. The family court simply stated: "[G]iven the circumstances and the payments, I'm

going to deny any request for the modification of child support." That conclusory statement does not provide the factual findings and conclusions of law required by Rule 1:7-4(a). Nor does that statement allow us to engage in meaningful appellate review. See Shulas v. Estabrook, 385 N.J. Super. 91, 96 (App. Div. 2006) (recognizing appellate review was "hampered" by trial court's inadequate explanation of the basis for its decision).

Accordingly, we vacate the provision of the June 28, 2019 order denying plaintiff's application to terminate child support and remand so that the family court can make a decision supported with findings of fact and conclusions of law.

D.  Attorney's Fees

We review a trial court's order concerning attorney's fees under an abuse of discretion standard. Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (citing Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). N.J.S.A. 2A:34-23 authorizes family courts to award counsel fees in a matrimonial action after a judge considers "the factors set forth in the court rule on counsel fees, the financial circumstances of the parties, and the good faith or bad faith of either party." Chestone v. Chestone, 322 N.J. Super. 250, 255-56 (App. Div. 1999) (quoting N.J.S.A. 2A:34-23).

Rule 4:42-9(a)(1) provides that, "[i]n a family action, a fee allowance both pendente lite and on final determination may be made pursuant to [Rule] 5:3-5(c)."  Rule 5:3-5(c) states that a court should consider nine factors, including "the reasonableness and good faith of the positions advanced by the parties[.]"

The family court here identified the factors enumerated in Rule 5:3-5(c) and found that those factors did not support an award of counsel fees to either party.  The family court also found that neither party had acted in bad faith.  We discern no abuse of discretion in those determinations.

E.  Defendant's Request for Alleged Unpaid Support Owed for 2017

Defendant contends that the family court erred in not requiring plaintiff to pay her $61,750 in alimony and $7,275 in child support allegedly owed for 2017.  We decline to consider this issue for two reasons.

First, defendant never raised this issue in the family court.  A review of the record establishes that defendant did not file a cross-motion concerning this issue, nor did she present testimony clearly identifying the issue.  Consequently, the family court did not consider her claim. Absent certain circumstances, which are not present here, we generally decline to consider issues that were not raised in the family court.  See N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 339 (2010); see also N.J. Div. of Youth & Fam. Servs. v. B.H., 391 N.J.

Super. 322, 343 (App. Div. 2007) (citing Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)); but cf. Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 581 n.7 (App. Div. 2016) (electing to review factors not raised to, but considered by, a family court judge on appeal).

Second, defendant did not raise this issue in her initial brief; rather, she first raised it in her reply. Raising an issue for the first time in a reply brief is improper, and we generally will not consider such an issue. Borough of Berlin v. Remington & Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001); L.J. Zucca, Inc. v. Allen Bros. Wholesale Distribs. Inc., 434 N.J. Super. 60, 87 (App. Div. 2014) (noting "[a]n appellant may not raise new contentions for the first time in a reply brief"); see also N.J. Citizens Underwriting Reciprocal Exch. v. Collins, 399 N.J. Super. 40, 50 (App. Div. 2008) (declining to consider argument raised for the first time in reply brief as "not properly before [the appellate court]").[2]

While we decline to consider this issue, we nevertheless note that plaintiff has an obligation to pay twenty-five percent of his gross compensation in alimony to defendant. Consequently, if some amount of alimony is due to

---

[2] We considered the attorneys' fees issue because it had also been raised by plaintiff and was expressly addressed by the family court.

defendant, we expect the parties to resolve that issue in good faith. We further note, however, that good faith does not include raising arguments that could have been, but were not, raised at the plenary hearing. In her reply brief, defendant extrapolates from the alleged underpayment for 2017 and suggests that there may have been underpayments in 2018 and 2019. That argument includes applying interest on amounts that were not established in the record. In short, the parties should resolve any claim for underpayment of alimony in accordance with the formula in their Support Agreement.

F.    Conclusion

In summary, we affirm the provisions of the June 28, 2019 order addressing alimony and attorneys' fees. We decline to consider defendant's argument concerning an underpayment of alimony and child support. Finally, we reverse and remand the provision denying plaintiff's request concerning child support. We remand that issue with directions that the family court provide a decision supported by findings of fact and conclusions of law consistent with Rule 1:7-4(a).

Affirmed in part, reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5308-18T3