**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2817-19

M.S.[1],

     Plaintiff-Appellant,

v.

M.A.S.,

     Defendant-Respondent.

_____

          Argued February 4, 2021 – Decided  February 26, 2021

          Before Judges Yannotti, Mawla, and Natali.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0670-15.

          Robert M. Zaleski argued the cause for appellant (Law Offices of Paone, Zaleski & Murphy, attorneys; Robert M. Zaleski and John P. Paone, III, on the briefs).

          Bonnie C. Frost argued the cause for respondent (Einhorn, Barbarito, Frost & Botwinick, attorneys; Bonnie C. Frost, Matheu D. Nunn, and Jillian P. Freda, on the brief).

---

[1] We utilize initials to protect the parties' privacy. R. 1:38-3(d)(1).

PER CURIAM

This matter returns after we affirmed in part and reversed and remanded in part the trial court's post-judgment order adjudicating plaintiff M.S.'s request to terminate or modify alimony payable to defendant M.A.S. M.S. v. M.A.S., No. A-3937-17 (App. Div. May 7, 2019) (slip op. at 1). Plaintiff now appeals from a February 5, 2020 order denying the modification of alimony and granting defendant counsel fees. We affirm.

The parties were married for nearly thirteen years and had two children who reside with defendant. After filing a complaint for divorce, plaintiff filed a case information statement (CIS) in June 2013 setting forth the marital lifestyle at $32,091 per month. In November 2013, defendant filed a CIS depicting a marital lifestyle of $17,526. The complaint for divorce was dismissed, and in September 2014 the parties purchased a home in Basking Ridge where defendant and the children resided. The parties executed a Divorce Settlement Agreement (DSA) on August 28, 2015 and were divorced on December 8, 2015.

The relevant provisions of the DSA read as follows:

> 4. The parties acknowledge that the [plaintiff] . . . is paid a base salary of $405,000[] per year and is eligible to earn additional incentive compensation including but not limited to cash bonuses and stock options. . . . The parties acknowledge that the

[defendant] is currently employed as a part time self-employed consultant to the pharmaceutical industry. For purposes of determining the [plaintiff's] alimony obligations set forth herein, gross earned income of $110,000[] per year was imputed to the [defendant]. Her current income is uncertain, however in no event shall gross earned income of less than $110,000[] per year be imputed to the [defendant].

5. The parties have agreed that the [plaintiff] shall have a limited duration alimony obligation for a total of ten . . . years. Specifically, he shall pay "base" and "additional" limited duration alimony for eight . . . years, followed by "base" alimony only for two . . . years thereafter as follows:

5. (A) Commencing upon the [first] day of the month following the execution of this [a]greement by both parties, and for a period of eight . . . years, the [plaintiff] shall also pay to the [defendant] base limited duration alimony in the sum of $100,000[] per year at the rate of $8333.33 per month . . . .

(B) Commencing upon the [first] day of the month following the execution of this [a]greement by both parties, and for a period of eight . . . years, the [plaintiff] shall pay to the [defendant] as "additional" limited duration alimony, the sum of [twenty-five percent] of any gross cash bonus paid to him during that eight . . . year period. The parties specifically acknowledge that this additional alimony obligation applies only to any gross cash bonus paid to him and does not apply to any other form of bonus or incentive compensation including but not limited to stock or stock options which may be earned by the [plaintiff] or paid to the [plaintiff]. The [plaintiff] shall have no "additional" limited duration alimony obligation to the

3

[defendant] after the expiration of this eight . . . year period.

> 6. Commencing upon the [first] day of the month following the expiration of the eight . . . year period provided for in paragraph . . . (5)(A) herein, and for a period of two . . . years, the [plaintiff] shall pay to the [defendant] limited duration alimony in the sum of $75,000[] per year at the rate of $6250[] per month . . . . [Plaintiff] shall have no "additional" limited duration alimony obligation to the [defendant] during this two . . . year period above and beyond his obligation to pay $75,000[] per year for two . . . years as provided for in this paragraph.

> . . . .

> 8. The parties have been advised of the [Lepis] decision ([Lepis v. Lepis], 83 N.J. 139 (1980)), and other appropriate statutes (including [N.J.S.A.] 2A:34-23), rules, and case law governing alimony. The parties understand that the amount of alimony provided hereunder may be modified or terminated accordingly. The parties further understand that the duration or term of the [plaintiff's] limited duration alimony obligation may only be modified upon a showing of unusual circumstances as set forth in [N.J.S.A.] 2A:34-23.

The parties also agreed alimony would terminate on either party's death, defendant's remarriage, and could suspend or terminate upon defendant's cohabitation as defined by statute.

The other relevant DSA provisions were as follows:

> 12. The parties have been made aware of the case of [Crews v. Crews], 164 [N.J.] 11 (2000) and the

4

related case law. The parties agree that based upon the terms of this [a]greement, they each have the ability to maintain the standard of living established during the marriage.

. . . .

19. Commencing upon [plaintiff] paying alimony and child support as provided for herein, the [plaintiff] shall satisfy [two-thirds] and the [defendant] shall satisfy [one-third] of the cost of reasonable extracurricular activities for the [children], provided that these items are discussed and mutually agreed upon by the parties, other than as set forth herein. However, based on the support provisions in the [a]greement, 100% of the stabling costs for the pony, shall be paid entirely by the [defendant]; but incidental costs incurred in connection with the pony such as veterinary bills or equipment shall be paid [two-thirds] by [plaintiff] and [one-third] by [defendant] provided they are discussed and agreed upon by the parties.

Similarly, paragraph twenty required plaintiff to bear two-thirds and defendant one-third of the children's private school education costs.

The DSA also required defendant to "remove the [plaintiff's] name from the mortgage indebtedness on the [Basking Ridge property], through refinance, assumption, or otherwise" within ninety days of the agreement. The DSA stated defendant had been previously represented by counsel but was self-represented at the time of entry of the agreement having voluntarily waived her right to counsel. It also stated defendant entered into the agreement voluntarily and was

5

"fully informed" of her rights and obligations under the agreement, which was a product of negotiation and "settlement conferences with counsel (when [defendant] was still represented . . .) and [plaintiff's] forensic experts . . . ."

In November 2017, plaintiff filed a motion to terminate alimony retroactive to April 2016, arguing the increase in defendant's income from the imputed amount of $110,000 to $190,000 constituted a change in circumstances. The motion judge agreed and entered an order reducing alimony to $73,500 per year retroactive to the motion filing date without holding a plenary hearing.

Plaintiff appealed from the trial judge's decision. We upheld the judge's finding of a change in circumstances. M.S., slip op. at 20. However, we concluded the judge "improperly resolved disputed, material questions of fact regarding the parties' marital standard of living without a plenary hearing, and failed to explain the factual basis for the $73,500 modified amount." Id. at 21. We remanded the matter for a plenary hearing and directed the judge to "provide factual findings consistent with Rule 1:7-4 detailing the bases for modifying the limited term alimony from $100,000 to $73,500 per year." Id. at 22.

Following the remand, the motion judge conducted a seven-day plenary hearing and considered testimony from both parties. Plaintiff stipulated to his ability to pay the alimony set forth in the DSA. Therefore, his income was not

6

an issue and the bulk of the testimony concerned the meaning of the DSA alimony provisions and defendant's financial circumstances.

Plaintiff testified the majority of the DSA negotiations took place in the "latter half of 2013 and early 2014" with the aid of the parties' attorneys and the forensic expert. However, the DSA was not signed until 2015 because the parties had not reached an agreement regarding the disposition of the Basking Ridge residence. He testified there were two or three draft agreements prepared between 2013 and 2014 and the DSA contained all the terms that were agreed to from the prior drafts. Plaintiff further testified defendant was no longer represented by counsel at "the time [the parties] got to the final point where [they] had incorporated the language into the agreement that dealt with the new property" in 2015. He noted both parties utilized the forensic expert to assist them in negotiating the terms related to the residence.

Plaintiff testified the $110,000 imputed income figure for defendant was a number she "felt comfortable committing to, based upon the uncertainty of her earning capacity because she was a consultant, and not always working on a full-time basis as a consultant." However, plaintiff did not recall discussing the amount of income defendant earned during the settlement negotiations. He

7

noted defendant was represented by counsel at the time the $110,000 figure was negotiated.

Plaintiff adduced a November 8, 2016 email correspondence between the parties which noted defendant's 2015 income from all sources was $103,600. The email stated defendant's projected income for 2016 would be $121,844 and $190,000 for 2017. The 2017 income did not include a potential bonus. Plaintiff pointed out defendant's certification in opposition to his motion to terminate alimony also reflected these figures.

Plaintiff testified he was responsible for "settling the bills and doing the finances" during the marriage. He stated the marital lifestyle was not accurately depicted in his original CIS. He adduced a spreadsheet which suggested a lower figure of $16,579 and explained the differences between his CIS and the spreadsheet.

Plaintiff acknowledged that in 2013 he was aware defendant had "demonstrated [an] earning potential of $190,000." He explained the $110,000 in paragraph four represented a "baseline" for determining alimony and "a guarantee from [his] perspective that in the future . . . [he] can't be asked to increase his level [of] support beyond that [which] . . . was agreed [to] in the agreement based on her earning less than $110,000 a year." However, plaintiff

8

also stated it was his expectation that if he could establish defendant earned more than $110,000 in the future, "it gave [him] the ability to reduce [his] alimony obligation." He noted the DSA contained no guarantee for the continuation of alimony as reflected by the Lepis provision which provided him "the opportunity to modify alimony, based on a change of circumstances that occurs after the agreement is signed." Plaintiff also noted the parties did not renegotiate the $110,000 income amount after initially agreeing to it in 2014 through the time they signed the DSA in 2015.

Plaintiff testified he unilaterally ceased paying alimony in February 2017. He conceded this was in violation of the DSA.

Defendant testified the $110,000 figure was included to protect plaintiff, "so that [she] couldn't go to him and say [she] only made [eighty] grand this year, you need to top me up on the alimony . . . ." She testified she did not agree "to have [her] alimony reduced if [her] salary goes up" and never discussed the scenario with plaintiff because "why would [she] take a job where [she] was going to lose $100,000 from [plaintiff]?"

Defendant adduced a copy of the parties' DSA she believed was drafted between 2013 and 2014, which she found on plaintiff's desk. A crossed-out paragraph in the draft stated:

7. Commencing with the 2015 calendar year, in the event that the [defendant] earns gross earned income in excess of $150,000[] per calendar year for any year wherein [plaintiff] has an alimony obligation to the [defendant], the [plaintiff's] alimony obligation for that year shall be reduced by the sum of [one-third] of any gross earned income by the [defendant] in excess of $150,000[] in that calendar year. In the event that the [defendant] is self-employed doing consulting or otherwise, her gross earned income from that self-employment shall be deemed her gross profits/receipts before any expenses. For example, if the [defendant] has gross earned income as a traditional W-2 wage earner (which shall be determined based on her Medicare wages on her W-2) of $150,000 in a year in addition to $50,000[] of gross profit/receipts from self-employment in that same year, the [defendant] shall reimburse the [plaintiff] the sum of $16,666.67. Additionally, for example, in the event the [defendant's] only employment in a year is self-employment, as a consultant or otherwise, and her gross profits/receipts are $200,000[], and she has business expenses of $50,000[], she shall reimburse the [plaintiff] the sum of $16,666.67. The [defendant] shall provide the [plaintiff] with her complete federal, state, and local income tax returns commencing with the 2015 tax year no later than April 2016 of every year wherein the [plaintiff] has an alimony obligation. The [defendant] shall pay the [plaintiff] any money due to be reimbursed to him no later than April 16 of every year the [plaintiff] has an alimony obligation, with the first potential reimbursement to [plaintiff] due in 2016 for the 2015 calendar year.

The draft also included typewritten comments in the margins from plaintiff corresponding to the same paragraph. The first comment asked: "Can

10

we increase the threshold here to $200,000[?]" The second comment stated: "We will delete this, so that [defendant] can earn as much as she likes without penalty. However, we will look for recognition of the good-faith gesture." A separate comment addressing a draft paragraph related to the children's extracurricular activities stated: "The [two-thirds] split is reasonable, particularly in light of [defendant's] income ($185,000 plus bonus)."

Defendant testified that when she began the process to refinance the mortgage for the Basking Ridge property pursuant to the DSA, she asked plaintiff for the deed. However, he would only turn over the deed "if [she] agree[d] to terminate alimony."

Defendant provided detailed testimony regarding her employment history. She explained she was hired as a full-time employee at a pharmaceutical company in September 2013 at a salary of $185,000 plus a $24,000 sign-on bonus. She also had the opportunity to receive a yearly performance bonus of twenty-three percent of her base salary. In 2014, she was laid off and received an $84,446 severance package that increased her taxable income from $152,672 to $237,118, which was reported on the parties' joint income tax return.

Defendant then worked as a full-time consultant for another company from September 2014 to December 2014. She then left that firm and became a

11

full-time employee at a different company from December 2014 to August 2015, earning a base salary of $180,000. Beginning in August 2015, she worked as a consultant at a different firm and for other clients, and after a three-month period of unemployment, began working as a salaried employee for a pharmaceutical company earning $190,000 per year. In 2015, defendant filed a tax return reporting wages of $123,757, business income of $50,000, and a total income from all sources of $178,010.

The motion judge issued a comprehensive oral decision finding plaintiff failed to prove a change in circumstances warranting a modification of alimony. The judge denied plaintiff's request for counsel fees and awarded defendant $31,500 in counsel fees.

The judge found plaintiff's "overall credibility [was] diminished by the unreasonable positions that he [had] maintained." He found plaintiff sought to downplay the marital lifestyle and his "analysis of the needs of the defendant and his two daughters [was] wholly self serving . . . [and] prepared spreadsheets and provided explanations which had the sole purpose of eliminating expenses to reduce his support obligations."

Regarding the DSA, the judge found plaintiff's "insistence that both parties knowingly agreed that the defendant's income was so uncertain that it

was reasonable to impute $110,000 per year to her for the purpose of alimony is not believable." The judge noted that under this interpretation plaintiff "could have moved to modify alimony the day after he was divorced." The judge concluded plaintiff "unquestionably knew that the defendant was making $185,000 per year plus bonus when the DSA was signed . . . ."

The judge also found plaintiff lacked credibility given the "the enormity of the relief [he] sought [in his motion,]" namely, to reduce alimony by ninety-three percent. The judge also concluded plaintiff's credibility was "severely undermined by his [self-help] by both improperly attempting to reduce his alimony obligation and then simply refusing to pay alimony."

With limited exceptions, the judge found defendant credible, noting her testimony was "candid, straightforward, and entirely believable." The judge noted her testimony was "very detailed" and on cross-examination she "answered all questions directly and without hesitation."

The judge found defendant provided conclusive evidence plaintiff knew she was earning $185,000 and the parties agreed she could earn as much money as she wanted in the future without fear of an alimony modification. The judge found defendant's income for the years 2001 through 2017 was as follows: $137,849, $79,000, $188,758, $237,118, $176,684, $196,500, and $185,225. In

light of the objective evidence of defendant's income, he concluded the imputation of $110,000 in paragraph four made "absolutely no sense because both parties knew that was not the case."  The judge noted defendant was not represented when the DSA was signed and a "competent attorney would have certainly questioned [the] inclusion [of paragraph four] and most likely would have insisted it be removed."

The judge also addressed the draft agreement defendant located on plaintiff's desk and stated:

> At the very end of the [p]lenary [h]earing a full copy of the draft was located by [defendant] and admitted into evidence . . . with the consent of the parties.  It is now clear that the handwriting which neither party could initially identify is that of [the forensic expert].  [Defendant] testified that the parties met with [the expert] around April of 2015.  On the first page of [the document] the author of the handwritten note states[:]  . . . "Went over with [plaintiff] and [defendant] on 4/6/15[.]" . . . This could only have been written by . . . the parties' joint financial advisor.  The parties did not meet together with either attorney.  It is not their handwriting.  It is definitely [the expert's] handwriting.
>
> Interestingly, his notes on page ten provide the best explanation as to how the $110,000 per year alimony was decided. He subtracted alimony and child support from [plaintiff's] salary.  Specifically his notes on top of page ten have [$]405,000 minus [$]100,000 minus [$]30,000, comes to [$]275,000 that is circled.  To the right of that is another column where $185,000

14

is circled, $100,000 is added in, $30,000 is added in, and the amount circled below is $315,000. That [$]100,000 . . . on those pages is the agreed upon alimony amount; the $30,000 is the agreed upon child support; the $405,000 figure is what [plaintiff] was earning which is reflected in paragraph four; and the $185,000 is the amount that both parties knew that [defendant] was earning; and that [plaintiff] provided that information to [the accountant].

The judge also found that plaintiff wrote the typewritten comments in the draft document's margins.

The judge rejected plaintiff's explanations regarding paragraph four and the drafting process. He noted

plaintiff testified that [p]aragraph [four] was drafted well in advance of the execution of the agreement. If true, that suggests that the language in [p]aragraph [four] imputing $110,000 per year to defendant was no longer the case and should not have been included when the DSA was executed in August of 2015. The changes to [p]aragraph [four] as set forth in [the draft DSA] suggest the plaintiff is incorrect as to the date the language at issue here was inserted. This adds further confusion to why that clause was inserted in [p]aragraph [four], the $110,000. It makes even less sense after reading the draft DSA.

Furthermore, the judge determined it would violate the parol evidence rule to include draft paragraph seven in the final DSA because it would undermine the language contained in the agreement whereby the parties agreed "the amount of alimony . . . may be modified or terminated . . . according to the decision of

15

Lepis . . . ." The judge found if the DSA had "been silent on modification, that would present a much stronger case for inserting [p]aragraph [seven] . . . ." He concluded it "would be unjust and inequitable to construe the agreements as suggested by the plaintiff."

He further concluded the language in paragraph four was not a "baseline" for the modification of alimony because the DSA did not state that earnings greater than $110,000 would constitute a change in circumstances, defendant did not agree plaintiff could reduce alimony if she earned more than this amount, and "both parties knew that [defendant] was making well in excess of $110,000 per year." He stated: "This is a case where the proofs absolutely establish that [plaintiff] at the time of the execution of the DSA and at the time of the divorce, no question[,] . . . knew that [defendant] was making approximately $185,000 per year."

The judge found the marital lifestyle was upper middle class to wealthy and quantified it at $27,117 per month. He determined the lifestyle figure beginning with the $32,091 monthly budget reported in plaintiff's CIS, deducting $5214 plaintiff attributed to his monthly expenses after the parties separated, and adding $240 for cell phone expenses paid by defendant omitted

16

from plaintiff's CIS. The judge concluded defendant and the children's needs totaled $24,079 per month.

As a result, the judge found plaintiff did not prove a change in circumstances to modify alimony because "defendant's financial needs [have] not changed greatly since the time of the divorce" and "her income has remained steady." The judge concluded "the proof establishes that the defendant needs $100,000 alimony now more than ever" because she expected to receive approximately $1,000,000 in equitable distribution from the sale of stock options earned during the marriage by plaintiff, which did not occur.

The judge awarded defendant $31,500 in attorney fees. He found plaintiff acted in bad faith because he "originally exercised self[-]help by terminating and reducing alimony without [c]ourt permission . . . despite his undisputed ability to pay." The judge noted plaintiff had "no good reason not to sign over the [d]eed to [defendant] when she refinanced the [Basking Ridge property and] . . . used that refusal as . . . leverage to get [defendant] to reduce or eliminate alimony." The judge also found plaintiff's insistence that he did not know defendant was making $185,000 was unreasonable in light of the "overwhelming evidence to the contrary . . . ." He noted defendant incurred the fees to enforce the DSA and had prevailed.

## I.

On appeal, plaintiff argues the judge failed to enforce the terms of the DSA as written and instead rewrote the parties' contract. He asserts paragraph four's use of the term "imput[ation] confirms that the sum of $110,000 was assigned to the [defendant] by mutual consent of the parties." He argues the judge's admission of the draft DSA and application of parol evidence rule was reversible error because the draft agreement was used to modify rather than enforce the terms of the DSA. He argues the draft DSA had no probative value because it was taken from him without his knowledge, was not authenticated, and its admission violated attorney-client privilege.

Plaintiff challenges the judge's credibility and factual findings, namely, that the parties knew defendant's income was $185,000 as well as the findings related to the marital lifestyle, defendant's needs, and that there was no change in circumstances.

Plaintiff also contests the counsel fee award. He argues the finding of bad faith is unsupported and the judge failed to consider defendant's "vastly improved financial circumstances" before awarding her fees.

A-2817-19

## II.

"The scope of appellate review of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998).  A trial court's opinion is "binding on appeal when supported by adequate, substantial, credible evidence." Id. at 412 (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).  "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'"  Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

"Appellate courts accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters."  Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412). "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses.'"  Cesare, 154 N.J. at 412 (alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)).  "We do 'not disturb the "factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."'"  Gnall v. Gnall, 222 N.J. 414, 428 (2015) (alterations in original)

(quoting Cesare, 154 N.J. at 412).  Therefore, "'[o]nly when the trial court's conclusions are so "clearly mistaken" or "wide of the mark" should we interfere[.]'"  Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).  However, "we owe no deference to the judge's decision on an issue of law or the legal consequences that flow from established facts."  Dever v. Howell, 456 N.J. Super. 300, 309 (App. Div. 2018).

Our Supreme Court has stated:

> A settlement agreement is governed by basic contract principles.  J.B. v. W.B., 215 N.J. 305, 326 (2013) (citing Pacifico v. Pacifico, 190 N.J. 258, 265 (2007)).  Among those principles are that courts should discern and implement the intentions of the parties.  Pacifico, 190 N.J. at 266 (citing Tessmar v. Grosner, 23 N.J. 193, 201 (1957)).  It is not the function of the court to rewrite or revise an agreement when the intent of the parties is clear.  J.B., 215 N.J. at 326 (citing Miller v. Miller, 160 N.J. 408, 419 (1999)).  Stated differently, the parties cannot expect a court to present to them a contract better than or different from the agreement they struck between themselves.  Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960) (citations omitted).  Thus, when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.  See Sachau v. Sachau, 206 N.J. 1, 5-6 (2011) ("A court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the expressed general purpose." (internal quotations and citations omitted)).  To the extent that there is any ambiguity in the expression of the terms of

20

> a settlement agreement, a hearing may be necessary to discern the intent of the parties at the time the agreement was entered and to implement that intent. Pacifico, 190 N.J. at 267.
>
> [Quinn v. Quinn, 225 N.J. 34, 45 (2016).]

We reject plaintiff's argument that the judge failed to adhere to Quinn and instead modified the DSA. In context of the facts and circumstances of this case, paragraph four was ambiguous, and each party had a plausible but different understanding of its meaning. Contrary to plaintiff's argument, the judge adhered to Quinn by assessing the totality of the circumstances, including those surrounding the negotiation of the DSA, to understand the parties' intent in crafting the imputation language. The substantial credible evidence supports the judge's conclusion the provision was intended to prevent defendant from seeking greater alimony in the event her income fell below $110,000. Interpreting the provision otherwise would have required the judge to ignore the bulk of evidence presented.

We reject plaintiff's assertion the judge could not rely on the draft DSA to determine the parties' intent. Plaintiff consented to the admission of the draft DSA into evidence. Therefore, plaintiff's arguments the document was taken from him without consent and his objections on grounds of authentication and attorney-client privilege lack merit.

21

Our Supreme Court has adopted the "expansive view of the parol evidence rule, which was adopted in the Second Restatement of Contracts." Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 268-69 (2006). This view permits

> a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties. Extrinsic evidence may be used to uncover the true meaning of contractual terms. It is only after the meaning of the contract is discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract.
>
> [Id. at 270.]

As we noted in Garden State Plaza v. S.S. Kresge Company, "[c]onstruing a contract of debatable meaning by resort to surrounding and antecedent circumstances and negotiations for light as to the meaning of the words used is never a violation of the parol evidence rule." 78 N.J. Super. 485, 496 (App. Div. 1963). "Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity." Atl. N. Airlines v. Schwimmer, 12 N.J. 293, 301 (1953).

Here, paragraph four could be interpreted either as means of preventing defendant from seeking an increase in alimony if her income dipped below $110,000, or that plaintiff could seek a modification of alimony if defendant's

income exceeded $110,000. The parties' common intent could not be ascertained from reading the DSA alone. Therefore, the trial judge could use parol evidence to interpret the DSA. Moreover, the resulting interpretation did not modify the DSA, but rather interpreted it in a logical fashion consistent with the parties' circumstances and the substantial credible evidence in the record.

We do not reach plaintiff's arguments challenging the judge's findings relating to the marital lifestyle and defendant's need for alimony because we have affirmed the finding there was no change in circumstances. Even if we were to address the marital lifestyle findings, the judge complied with precedent because he described the marital lifestyle and quantified it. S.W. v. G.M., 462 N.J. Super. 522, 532 (App. Div. 2020).

III.

Finally, we affirm the counsel fee award. We reject plaintiff's assertion the record did not support the judge's finding of bad faith and that the judge failed to consider defendant's financial circumstances.

An award "of counsel fees is discretionary, and will not be reversed except upon a showing of an abuse of discretion." Barr v. Barr, 418 N.J. Super. 18, 46 (App. Div. 2011) (citation omitted). Rule 5:3-5(c) lists nine factors the court

must consider in making an award of counsel fees in a family action. Essentially,

> in awarding counsel fees, the court must consider whether the party requesting the fees is in financial need; whether the party against whom the fees are sought has the ability to pay; the good or bad faith of either party in pursuing or defending the action; the nature and extent of the services rendered; and the reasonableness of the fees.
>
> [Mani v. Mani, 183 N.J. 70, 94-95 (2005) (emphasis omitted) (citations omitted).]

Even when there is not a financial disparity between the parties, "where a party acts in bad faith the purpose of a counsel fee award is to protect the innocent party from unnecessary costs and to punish the guilty party." Welch v. Welch, 401 N.J. Super. 438, 448 (Ch. Div. 2008) (citing Yueh v. Yueh, 329 N.J. Super. 447, 461 (App. Div. 2000)); see also Kelly v. Kelly, 262 N.J. Super. 303, 307 (Ch. Div. 1992) (holding "where one party acts in bad faith, the relative economic position of the parties has little relevance.").

Standing alone, the parties' dispute regarding the interpretation of the DSA would not merit an award of counsel fees on grounds of bad faith. However, defendant incurred substantial counsel fees due to plaintiff's admitted refusal to comply with his obligations under the DSA to pay alimony and transfer the residence into defendant's name. Plaintiff's stipulation that he could

24

pay the alimony required in DSA only compounded his bad faith refusal to pay it.  Because the record supports the bad faith finding, the judge was not required to consider defendant's financial circumstances.  Regardless, the counsel fee award represented approximately thirty-eight percent of defendant's total counsel fees and did not constitute an abuse of discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2817-19